FIRST DIVISION
March 28, 2016

No. 1-15-2262
2016 IL App (1st) 152262

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* NYLANI M., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | Appeal from the |
| | ) | Circuit Court of Cook County, |
| Petitioner-Appellee, | ) | Child Protection Division. |
| | ) | |
| v. | ) | 10 JA 784 |
| | ) | |
| Bianca M., | ) | |
| | ) | Honorable Marilyn Johnson, |
| Respondent-Appellant). | ) | Judge Presiding. |
| | ) | |

JUSTICE CONNORS delivered the judgment of the court, with opinion.
Presiding Justice Liu and Justice Harris concurred in the judgment and opinion.

**OPINION**

¶ 1     This is an expedited appeal that concerns the care and custody of a minor.  On July 21, 2015, the trial court found respondent mother, Bianca M. (respondent), and father, Bruce S. (Bruce),[1] unfit to parent their minor child, Nylani M. (Nylani),[2] and that it was in the best interest of the child that their parental rights be terminated.  Respondent appeals, arguing that she was denied a fair hearing due to improper admission of evidence and the court's findings were against the manifest weight of the evidence.  For the reasons set forth below, we affirm.

¶ 2                                    BACKGROUND

---

[1]     Nylani's father, Bruce S., is not a party to this appeal.
[2]     Throughout the proceedings below and on appeal, Nylani has been represented by the Cook County public guardian's office.  Thus, any arguments made by "the public guardian" are on behalf of Nylani.

¶ 3     Nylani, a female minor, was born on May 20, 2010.   On September 3, 2010, petitioner, the State,[3] filed a petition for adjudication of wardship and a motion for temporary custody, alleging that Nylani was abused and neglected and there was an immediate and urgent necessity to remove Nylani from the care of respondent and Bruce.  The State's petition and motion stated the following factual basis for the relief sought: respondent has three other minor children who are not in her care and custody; respondent has one prior "indicated report"[4] for bone fractures and head injuries to one of her other minor children; respondent was convicted of aggravated domestic battery to this other minor child; the putative father was a registered sex offender and had one prior indicated report for sexual penetration; respondent and father live together at 4908 West Warner in Chicago (the Warner address); and paternity had not been established.

¶ 4     On September 3, 2010, with both respondent and Bruce present in court, the juvenile court conducted a temporary custody hearing and entered orders, which, *inter alia*, reflected the court's finding that: probable cause existed supporting the factual basis alleged in the State's motion; probable cause existed to remove Nylani from her parents' home; and reasonable efforts have been made but have not eliminated the immediate and urgent necessity to remove Nylani from her parents' home.  The court also ordered Nylani placed in DCFS temporary custody[5] and granted the parents limited, supervised visits.  Additionally, on that same date, respondent and Bruce completed affidavits that showed that they were married and lived together at the Warner address.

---

[3]     Both the public guardian and the State filed response briefs to this appeal.  However, the State adopted the majority of the public guardian's brief.  Therefore, in the interests of clarity, we note that, in our analysis section only, where we refer to an argument the public guardian made, it is implied that the State adopted such an argument. Any instance where the State made a relevant, distinct argument is noted in the body of this order.

[4]     According to section 3 of the Abused and Neglected Child Reporting Act, " '[a]n indicated report' means a report made under this Act if an investigation determines that credible evidence of the alleged abuse or neglect exists."  325 ILCS 5/3 (West 2014).

[5] Nylani was placed in the home of her maternal grandmother, who also had custody of respondent's other three children.

¶ 5     On February 7, 2011, a genetic testing report showing that Bruce was Nylani's biological father was filed.  Additionally, a report to the court from a case manager at Centers for New Horizons (Horizons) was entered, which stated that although Nylani was not the direct target of abuse at that time, her three siblings were removed from respondent's care due to abuse in 2006.  Specifically, one of respondent's other children, who at the time was three months old, suffered significant head injuries, for which respondent was arrested and subsequently incarcerated for three years.  Additionally, the report reflected Bruce's previous indicated report, dated July 30, 2008, which resulted from an outcry from a 13-year-old female who alleged Bruce sexually penetrated her.

¶ 6     At a status hearing on February 23, 2011, another Horizons report was filed with the court, stating that on February 18, 2011, Nylani's foster parent, her maternal grandmother, issued a 14-day notice of removal.  The report reflected that Nylani's grandmother's decision to remove Nylani from her home was "due to the on[-]going conflict between [respondent] and [Bruce] with the current foster parent.  Foster parent reported to the agency they both have behaved inappropriately in her home and with [Nylani]."

¶ 7     On May 9, 2011, the court conducted an adjudicatory hearing and entered an adjudication order pursuant to section 2-21 of the Juvenile Court Act of 1987 (705 ILCS 405/2-21 (West 2010)).  The order stated that the court found Nylani to be abused or neglected as a resulted of stipulated testimony.  Specifically, the parties stipulated that if called to testify, DCFS worker Ann Marakis would testify that respondent pled guilty to and was convicted of aggravated domestic battery of one of her other children in criminal case 07 CR 0078901; she was sentenced to Illinois Department of Corrections for that conviction; and her children were placed in the guardianship of her mother.  Marakis would also testify that Bruce was a registered sex offender

and had multiple felony convictions, including aggravated criminal sexual assault, home invasion, aggravated stalking, failure to report change of address, possession of a controlled substance, and manufacturing/delivery of cocaine. The court also found Nylani's abuse or neglect was inflicted by a parent.

¶ 8 On June 9, 2011, the court conducted a dispositional hearing regarding Nylani's placement. Respondent's individual counseling initial report[6] from Mary & Tom Leo Associates, Inc. (MTLA), a family counseling service, was entered as one of the State's exhibits. The MTLA report stated that respondent denied being the perpetrator of the abuse of her other child, for which she was incarcerated. Another State exhibit was a Treatment Alternatives for Safe Communities (TASC) report regarding respondent's drug use and treatment program options. Ultimately, the court entered a disposition order that adjudicated Nylani to be a ward of the court, it being in her and the public's best interest and welfare. Both respondent and Bruce were found to be "unable for some reason other than financial circumstances alone to care for, protect, train or discipline the minor." Additionally, the court's order reflected, *inter alia*, that "appropriate services aimed at family preservation and family reunification have been unsuccessful" and that "[i]t is in the best interest of the minor to remove the minor from the custody of the parents, guardian[,] or custodian." Nylani was placed in the guardianship of a DCFS guardianship administrator with the right to place her. Also on June 9, 2011, the first of many permanency orders was entered in this matter. That order stated that the appropriate permanency goal was for Nylani to return home within 12 months. That order also stated that neither respondent nor Bruce had made substantial progress towards Nylani's return home, but that the court found both parents made some progress. Throughout approximately the next three

---

[6] The report reflected that it covered the time period of February 11, 2011, through May 11, 2011.

4

years, there were numerous permanency orders entered, with some reflecting that respondent made substantial progress.

¶ 9    On April 20, 2012, a Horizons report dated April 10, 2012, was filed with the court. The report stated that respondent and Bruce's unsupervised visits had been suspended as a result of an investigation that was prompted because on January 24, 2012, Nylani, who at the time was 22 months, tested positive for gonorrhea. The report also stated that respondent and Bruce were living together at the Warner address and Nylani was now living at a preadoptive foster home. The court entered a new visitation order on April 23, 2013, which allowed respondent to have unsupervised visits with Nylani in public places, but contact between Nylani and Bruce remained prohibited. On July 19, 2013, the court granted respondent unsupervised overnight visits with the continued condition that Bruce not be allowed contact with Nylani.

¶ 10    On April 9, 2014, Nylani participated in a victim sensitive interview during which she stated that her "poppy" lives with her mommy. On May 21, 2014, the court ordered that the appropriate permanency goal was substitute care pending court determination of parental rights. The court's basis for this change in goal was respondent's lack of progress in services.

¶ 11    On September 14, 2014, the State filed a supplemental petition for the appointment of a guardian with the right to consent to adoption. Regarding respondent, the supplemental petition alleged she was unfit pursuant to sections 1(D)(b), (i), and (m) of the Adoption Act (Act) (750 ILCS 50/1(D)(b), (i), (m) (West 2012)), and section 2-29 of the Juvenile Court Act of 1987 (705 ILCS 405/2-29 (West 2012)). Specifically, the supplemental petition alleged that respondent: failed to maintain a reasonable degree of interest, concern or responsibility as to Nylani's welfare in violation of section 1(D)(b) of the Act; behaved in a depraved manner in violation of section 1(D)(i) of the Act; and failed to make reasonable efforts to correct the conditions that were the

basis for the removal of Nylani from her during any nine-month period following the adjudication of neglect or abuse in violation of section 1(D)(m) of the Act. The supplemental petition further alleged that it was in the best interest of Nylani that a guardian be appointed in order to consent to adoption because the foster mother, Tammy I. (Tammy), with whom Nylani resided since October 31, 2011, desired to adopt Nylani, and it was in Nylani's best interest that she be adopted.

¶ 12                                                    Fitness Hearing

¶ 13    The juvenile court conducted the fitness hearing that is the subject of this appeal on June 29, 2015. Respondent was not present at the hearing. Her counsel moved for a continuance, but the request was denied. Prior to any live witness testimony, the court took judicial notice of the following permanency orders per respondent's counsel's request: June 9, 2011 (respondent made some progress); April 10, 2012 (respondent made substantial progress); July 25, 2012 (respondent made substantial progress); January 23, 2013 (no substantial progress); July 19, 2013 (respondent made substantial progress); January 7, 2014 (respondent made substantial progress); and May 21, 2014 (court entered an order of substitute care pending determination on termination of parental rights).

¶ 14    Per the State's request, the court took also judicial notice of the finding of paternity and the May 9, 2011, findings of abuse and neglect. Additionally, the trial court took judicial notice of the June 9, 2011, dispositional hearing in which Nylani was adjudicated a ward of the court and placed in DCFS guardianship. By agreement of the parties, the court also entered the following exhibits into evidence:

- Bruce's criminal convictions

- respondent's criminal conviction

- service plans initiated on 10 different dates

- family counseling reports from MTLA

- Bruce's counseling reports from MTLA

- respondent's counseling reports from Evans & Evans

- respondent's January 21, 2013, psychological evaluation

- respondent's August 19, 2013, parenting capacity evaluation

- report to the court dated July 2, 2012

- Horizons' reports to the court

- correspondence from Forward, P.C. regarding Bruce's adult sex abuse perpetrator assessment

- Horizons correspondence

¶ 15    As its first witness, the State called Odie Payne, the caseworker from Lakeside Community Center (Lakeside) assigned to Nylani's case since August 2012.  Payne identified two of the State's exhibits as correspondence from Lakeside and another exhibit as a letter from the director of KinderCare, the center where Nylani attended prekindergarten.  These documents had been kept in Lakeside's case file.  The State moved for these exhibits to be admitted into evidence, but respondent objected on hearsay grounds.  The court admitted them into evidence under the business records exception to the hearsay rule.  As to the letter from the KinderCare director, Payne testified that he had asked the director to document Nylani's issues that they had discussed in a phone call and in person. In the letter, dated September 14, 2013, the director stated that "Nylani has been using really fowl [*sic*] language and her behavior has really changed."  The letter also stated that Nylani had been showing aggressive behavior and that

7

"when [Nylani] comes from visits with [respondent], she is always talking about visiting and going to the park with her papi and mom and giving very detailed descriptions of the park."

¶ 16    Payne further testified that when he was assigned Nylani's case in August 2012, in order to achieve reunification, respondent needed to complete individual counseling, random drug drops, and participate in supervised visits.  Payne testified that, during the first couple months he was on the case, respondent attended some therapy sessions and her drops were always negative; thus, he had a positive perspective of respondent.  Payne testified that in December 2012, during a supervised visit in respondent's home at the Warner address, the buzzer sounded, respondent immediately pressed the button for the door to open without questioning who was there, and Bruce came into the apartment.  Payne stated that it was the first time Payne had met Bruce and he was unaware that Bruce would be attending the visit.  At that time, although a no-contact order was not in place, Bruce was only allowed to have prearranged, supervised visits with Nylani.  During that visit, Payne observed Nylani call Bruce "poppy."  At that time, Payne did not know where Bruce was living and respondent told him she thought he was in Iowa.  Payne stated that when he completed diligent searches for Bruce's address, he learned that Bruce received public aid checks at the Warner address.  Payne testified that when he asked respondent about this, she denied that Bruce received mail there.  Payne stated that during his diligent search for Bruce, he looked on the sex offender registry and found that Bruce was listed at a Kimball Avenue address.  Payne attempted to physically locate Bruce at that address, but he was unable to do so.

¶ 17    Payne testified that, prior to receiving the September 14, 2013, KinderCare letter, he had concerns that there was contact between Nylani and Bruce during unsupervised visits because Nylani had used the term "poppy."  Also, Payne stated that sometime after receiving the

8

KinderCare letter, when he picked Nylani up from school, she said that she saw "poppy." Payne did not ask any further questions on this issue because he did not want Nylani to feel like he was pressuring her for information. On another occasion around February 2014, Payne testified that while at Tammy's home, Nylani showed him a pen that she said Bruce had given her. However, Payne did not know when Bruce gave Nylani the pen. Payne further testified that he spoke directly with respondent regarding Nylani's contact with Bruce and that respondent denied any contact. Payne testified that once the unsupervised visits began, he noticed a pattern change wherein respondent appeared to be less forthcoming with information. Additionally, although Nylani had mentioned during this time period that she saw her "poppy" and that "poppy spent the night," respondent denied knowing Bruce's whereabouts and continued to say Nylani did not see him. Payne stated that respondent was admonished that if Nylani had contact with Bruce, then her visits would be suspended. Payne testified that respondent's unsupervised visits were suspended in February 2014, because different sources, including Nylani's therapist and a worker from the division of child protection (DCP)[7], concluded that "something was going on with contact [with Bruce]."

¶ 18    Payne testified that on May 21, 2014, the permanency goal was changed to termination of parental rights based on information from the therapist and DCP worker that respondent "had not honored what we asked her to do, which was to make sure that [Nylani] was safe. There was reason to believe that [Bruce] was, indeed, in the picture." Payne further testified that based on the permanency goal change, he gave respondent information regarding community-based services that she could use to help towards reunification, but to his knowledge, respondent never brought him any documentation that she completed those services. Payne testified that when he

---

[7] According to Payne's testimony, the DCP worker was specifically investigating the claim of Bruce's contact with Nylani, and as a result of that investigation, there was an indicated finding.

conducted spot checks at respondent's home at the Warner address in the summer of 2014, he never found "any things which were male oriented, clothing items, shoes, shaving cream, anything like that." After the goal change, respondent moved in with her sister-in-law. Payne testified that since he began working on Nylani's case in 2012, he had never felt able to recommend the return of Nylani to respondent's custody. Payne added that although respondent had completed therapy and her parental capacity assessment, respondent did not complete the additional recommended treatment.

¶ 19    The State's next witness was Tammy, who testified that she had been Nylani's foster mother since October 31, 2011. Tammy stated she had a cordial relationship with respondent. Regarding Nylani's contact with Bruce, Tammy stated that there were several times that Nylani talked about having contact with her father. She stated that the first time was in spring 2013 when she asked Nylani about an after-school visit with respondent. Tammy testified, "[Nylani] said she seen [*sic*] her [p]oppy. She said I went to the park, but my [p]oppy got stuck in the *** slide." Tammy then shared this information with the social workers.

¶ 20    Tammy further testified that on two different occasions in November and December 2014, respondent asked her if Nylani could speak to Bruce because it was the holidays. Tammy told respondent she could not let Nylani speak to Bruce per Payne's instructions. Tammy stated that in April or May of 2015, respondent again asked if Bruce could have contact with Nylani. Tammy told Payne about respondent's requests for contact with Bruce. Tammy testified that Nylani never returned physically harmed from a visit with respondent.

¶ 21    The court then took judicial notice of a May 21, 2014, status hearing transcript and the State rested. On June 23, 2015, the court held a hearing regarding respondent's objections to the introduction of this transcript. The court ruled that it would allow the transcript to be admitted

into evidence, but that a portion that included a statement from Nylani would be excluded because it was hearsay. At the fitness hearing, respondent's counsel renewed his objection to the introduction of this evidence, and the court overruled it, making clear that the court was not taking judicial notice of matters relating to the part of the transcript that the court determined was hearsay.

¶ 22 For its case, the public guardian presented the following exhibits: a DCFS letter, dated April 28, 2014, which reflected that respondent had been "indicated," meaning that "credible evidence of child abuse or neglect was found during this investigation," because respondent allowed a sex offender access to Nylani, creating a substantial risk of sexual abuse and injury to her health and welfare; a written report from Nylani's April 9, 2014, victim sensitive interview; a photograph from respondent's Facebook page showing her and Bruce, printed on April 9, 2014; and a photo from Desiree Valle's Facebook page that showed respondent and four other women. The public guardian also presented a June 29, 2015, printout from the Illinois adult sex offender registry, and asked that the court take judicial notice of the fact that the Warner address was listed as Bruce's current residence on the printout. The court took judicial notice of this fact over respondent's objection. The public guardian then called Edgar Maldonado, supervisor of the public guardian's investigations unit, as its witness. He testified that he conducted an investigation in Nylani's case in April 2014, which included searching online databases for respondent and Bruce. For respondent, Maldonado stated he searched Clear database and LexisNexis. He also found a Facebook page for respondent in which respondent had posted a photo of her and Bruce on February 4, 2014. Maldonado did not know when the photo was taken. At that point, upon request from the public guardian and over respondent's objection, the court took judicial notice of the fact that respondent had identified herself in two photographs

from her Facebook page. Maldonado further testified that during his investigation, in his efforts to determine where Bruce resided, he traveled to 5140 Kimball Avenue, which was listed as Bruce's address on the sex offender registry at the time. At that address, he observed Bruce's surname on one of the mailboxes. Maldonado also testified that during a May 21, 2014, telephone conversation, the owner of the property, Alex Juarez, stated that Bruce never resided at that address and a woman named Desiree Valle lived there. Maldonado stated that he found a Facebook profile of a "Desiree Valle" and found a photo of respondent with four other women posted on Valle's Facebook page on March 16, 2014. Respondent objected to all of the testimony regarding Valle and Maldonado's searches regarding the Kimball address.

¶ 23    No witnesses were called on behalf of respondent. However, two exhibits were introduced: a therapy progress report dated May 29, 2014, and a certificate of completion of parenting classes.

¶ 24    On July 21, 2015, the court orally presented its ruling on the issue of unfitness. The court began by pointing out that it had presided over this case since its inception and recognizing that this case had come before the court "in large part based on [respondent's] history of prior abuse of a child, specifically a son, for criminal prosecution and conviction and because of [Bruce's] history and background as a registered sex offender." The court recognized that throughout the course of this case respondent had engaged in the services towards reunification and Bruce did not. The court also stated that respondent "was very much on track for return home throughout a number of permanency hearings held in this case." Conversely, the court also emphasized that there was well-documented evidence that respondent, on numerous occasions, gave Bruce access to Nylani, which created a significant risk of harm, and the court cited instances where Nylani talked about seeing Bruce as further support. The court stated that it found the testimony of

Payne and Tammy to be "quite credible." The court went on to explain that it believed that when she was able, respondent gave Bruce access to Nylani, specifically pointing out phone calls discussed by Tammy where respondent asked that Nylani be able to speak to Bruce. The court found Maldonado's testimony to be corroborative of the "notion that [respondent] and [Bruce] continue to have contact." The court cited *In re K.S.*, 203 Ill. App. 3d 586 (1990), as being analogous to this matter because that case also dealt with one parent who has completed steps towards reunification but the other had not, and the parent who had made progress persisted in continuing contact with the problematic parent. Ultimately, the court opined,

> "the fact remains [respondent] never manifest[ed] the insight about why she could
>
> not give access to her daughter by [Bruce]. [Bruce] is a registered sex offender. He has a
>
> conviction for aggravated criminal sexual assault. In a wholly separate incident, he has
>
> an indicated finding for sexual penetration against a 13-year when he was 33. Clearly, a
>
> very heightened significant risk of harm that [respondent], for whatever reason,
>
> diminishes or does not understand why [Bruce] cannot have access to this child."

The court concluded that the State had met its burden by clear and convincing evidence, specifically finding respondent unfit pursuant to subsection (m) of section 1(D) of the Act (750 ILCS 50/1(D)(m) (West 2012)).

¶ 25                                    Best Interest Hearing

¶ 26    On July 21, 2015, the same date the court delivered its finding of unfitness, it also conducted the best interest hearing. The State called Tammy as its first witness. Tammy testified that she had been Nylani's foster parent for four years and that Nylani would be starting kindergarten that September. She testified that Nylani was currently in prekindergarten at KinderCare and that there had been an issue with another classmate regarding Nylani being of

mixed race. However, Tammy stated that she addressed the issue with the teacher and talked to Nylani about some of the issues she may face (being of mixed race) as she gets older. Further, Tammy testified that she had another foster child who was also mixed-race and that many of her relatives have biracial children. Tammy's family members are very familiar with Nylani and she believes they "absolutely" have accepted Nylani into their family. Tammy also stated that each year since she had Nylani, she had taken her to Puerto Rico to see relatives who live there and that Nylani loved it.

¶ 27    Regarding Nylani's natural siblings, Tammy testified that Nylani saw them each month for about three hours and that Nylani had fun when she was with them. Tammy stated that if she were to adopt Nylani, she thought continued supervised visits with Nylani's siblings would be "good for [Nylani]." Tammy also testified that if she were to adopt Nylani, she thought that Nylani's contact with respondent should continue "maybe every other month and holidays." Regarding Bruce, Tammy stated that if she were to adopt Nylani, she thought Nylani should have contact with him "at some point." Tammy testified that Nylani called her "mommy" or "mommy Tammy." Tammy also stated that since she has had Nylani in her care, Nylani has "grown into a really intelligent girl" and that previously she was "quiet and shy." Tammy further testified that Nylani liked to do activities and was involved in gymnastics, ballet, and tutoring. When asked if she wanted to adopt Nylani, Tammy replied, "I absolutely do."

¶ 28    The State next called Payne, who testified that during a 2 1/2 year period, he was able to observe Nylani in Tammy's home. Payne stated that Tammy is "very nurturing" and that her family absolutely adores Nylani, "completely embrac[ing] Nylani as one of theirs." Payne believed Tammy handled the race-related incident at KinderCare appropriately. Payne stated that he thought it was in Nylani's best interest that respondent's and Bruce's parental rights be

terminated based on the court's findings of unfitness. Payne stated he also thought it was in Nylani's best interest that she be adopted.

¶ 29    As evidenced by its July 21, 2015 order, the court found that terminating the rights of respondent and Bruce was in Nylani's best interest. The parental rights of respondent and Bruce were terminated on grounds of unfitness, the public guardian was given the power to consent to adoption, and the permanency goal was changed to adoption.

¶ 30    On August 7, 2015, respondent filed her timely notice of appeal.

¶ 31                                                ANALYSIS

¶ 32    On appeal, respondent makes two arguments: (1) she was denied a fair hearing and due process of law because the trial court improperly admitted numerous pieces of evidence at the hearing on parental fitness, and (2) the court's finding that she failed to make reasonable efforts and progress toward Nylani's return was against the manifest weight of the evidence.

¶ 33                          Admission of Evidence at Fitness Hearing

¶ 34    The circuit court's decision to admit or deny evidence during a parental rights termination hearing is reviewed under an abuse of discretion standard. *In re J.B.*, 346 Ill. App. 3d 77, 80 (2004). "Under this standard, the reviewing court must determine whether the circuit court acted arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted." (Internal quotation marks omitted.) *Id.*

¶ 35    Respondent argues that the court: improperly took judicial notice of Bruce's address contained on a printout of the sex offender registry; improperly admitted the KinderCare letter; improperly took judicial notice of the transcript from the May 21, 2014, permanency status

hearing; and improperly allowed Nylani's statements to be admitted. We will discuss each contention individually.

¶ 36    First, we examine respondent's claim that the court improperly took judicial notice of Bruce's address on the sex offender registry printout. A court may take judicial notice of matters generally known to the court and not subject to reasonable dispute. *In re A.B.*, 308 Ill. App. 3d 227, 237 (1999) (citing Michael H. Graham, Cleary & Graham's Handbook of Illinois Evidence § 201.1, at 56 (7th ed. 1999)). In this case, the court took judicial notice of the fact that the Illinois sex offender registry listed the Warner address as Bruce's residence at the time it was printed, which was June 29, 2015. Respondent argues that this was improper because the printout contained hearsay. The public guardian contends that the court's actions were appropriate because the printout falls under the public records exception to the hearsay rule. We agree. Illinois Rule of Evidence 803(8) (eff. Jan. 1, 2011) provides for an exception to the hearsay rule for

> "records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, police accident reports and in criminal cases medical records and matters observed by police officers and other law enforcement personnel, unless the sources of information or other circumstances indicate lack of trustworthiness."

Section 115(a) of the Sex Offender Community Notification Law imposes a duty on the Illinois State Police to create and maintain the sex offender database. 730 ILCS 152/115(a) (West 2012). As a result, we find that the court properly took judicial notice of the sex offender

registry printout because it fell within the public records exception to the hearsay rule set forth in Illinois Rule of Evidence 803(8) (eff. Jan. 1, 2011).

¶ 37    Second, we examine respondent's claim that at the fitness hearing, the court improperly admitted into evidence the letter from the director of KinderCare, dated September 14, 2013. Payne testified that he had spoken with KinderCare's director and asked that she write down the issues she believed Nylani was having.  The letter stated that "Nylani has been using really fowl [*sic*] language and her behavior has really changed."  The letter also stated that Nylani had been showing aggressive behavior and that "when [Nylani] comes from visits with [respondent], she is always talking about visiting and going to the park with her papi and mom and giving very detailed descriptions of the park."  Respondent argues that this letter is inadmissible hearsay and that Nylani's statements in the letter are double hearsay.  The public guardian responds that the trial court's determination that the letter was a business record was proper.

¶ 38    We agree with the public guardian.  Section 2-18(4)(a) of the Juvenile Court Act of 1987, which contains a variation of the common law business records exception, provides:

> "Any writing, record, photograph or x-ray of any hospital or public or private agency, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a minor in an abuse, neglect or dependency proceeding, shall be admissible in evidence as proof of that condition, act, transaction, occurrence or event, if the court finds that the document was made in the regular course of the business of the hospital or agency and that it was in the regular course of such business to make it, at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter."  705 ILCS 405/2-18(4)(a) (West 2012).

See also *In re S.J.*, 407 Ill. App. 3d 63, 69 (2011) (finding it is proper to apply rules of evidence

under the Juvenile Court Act of 1987 to a hearing regarding the termination of parental rights under the Act). Additionally, business records prepared in anticipation of litigation are not records made in the regular course of business and are not admissible under the business records exception. *A.B.*, 308 Ill. App. 3d at 236.

¶ 39 We find the court properly recognized the KinderCare letter under the business records exception to the hearsay rule. We first point out that under the business records exception, it is the business record itself, not the testimony of a witness who makes reference to the record, which is admissible. *Id.* Thus, the question before us is whether the letter itself was improperly admitted into evidence, not Payne's testimony regarding the letter.[8] We agree with the public guardian's contention that the purpose of the letter, in addition to reports from KinderCare, was to assist DCFS in determining which services were appropriate for respondent and Nylani. Payne testified that he had concerns about Nylani's behavior and that he requested the KinderCare director to document her observations in a letter. Thus, the letter was created in order to assist DCFS with its services and Nylani's care. Merely because the letter was eventually used in the parental fitness hearing does not signify its creation was for litigation purposes.

¶ 40 We further agree with the public guardian's assertion that the letter at issue here is similar to a client service plan or a parenting capacity assessment, both of which have been recognized by Illinois courts to come under the business records exception to the hearsay rule. See *In re Kenneth J.*, 352 Ill. App. 3d 967, 983 (2004) (holding that a parenting capacity assessment, although created as a result of the ongoing juvenile proceedings, was admissible as a business record); *A.B.*, 308 Ill. App. 3d at 236 (finding that client service plans are prepared by DCFS in

---

[8] Further, respondent does not make the argument on appeal that the court improperly admitted Payne's testimony. Rather, she argues the court improperly admitted the letter.

18

the regular course of business and their use in an adversarial-type proceeding is of no consequence).  Like the aforementioned cases, the situation here involves a letter that was prepared and kept in the ordinary course of business.  The letter resulted from concerns Payne had while monitoring Nylani's case and her need for services, and which he discussed with the KinderCare director. The letter expressly states, "I hope someone can look into this and advise us on ways to continue to help [Nylani] here at the center."  Thus, the letter, similar to a report, documented issues that Nylani was having at KinderCare in order to assist the care and assessments provided by DCFS.  The letter also reflects that it was created within a reasonable time after the events that it describes occurred.  Specifically, the letter begins by describing a phone call from respondent that occurred the day it was written.  Further, the letter also states, "[Nylani] has been showing a lot of aggressive behavior *lately*."  (Emphasis added.)  The use of the word "lately" suggests that the described events occurred within a recent time period.  Therefore, the letter satisfied all the requirements of the business records exception to the hearsay rule and the court properly admitted it.

¶ 41    Third, respondent argues that the court improperly took judicial notice of a transcript from the May 21, 2014, permanency status hearing because parts of the transcript were inadmissible hearsay.  Specifically, respondent argues that the improperly admitted evidence included testimony of office of the public guardian employee Maldonado, that the database searches showed that Valle, an acquaintance of respondent, resided at the Kimball address, which was listed on the sex offender registry as Bruce's residence when Maldonado conducted his investigation in 2014.  The public guardian contends that the court properly admitted the transcript because the court made it explicitly clear that it was only considering the admissible portions of the transcript and not any double hearsay.

19

¶ 42    We agree with the public guardian.  It is error for a court in a parental termination proceeding to take judicial notice of an entire court file without making a finding regarding the admissibility of the contents of the file.  *In re J.G.*, 298 Ill. App. 3d 617, 629 (1998) (holding that although it was error for court to take judicial notice of entire file, mother was not prejudiced by trial court's error given the properly admitted evidence was more than sufficient to establish her unfitness).  In this case, on June 8, 2015, the State filed its motion for judicial notice of prior testimony from the May 21, 2014, permanency status hearing, where Payne, Maldonado, and respondent testified.  Respondent filed a response to the State's motion and the parties conducted oral argument in a hearing before the court on June 23, 2015.  After the hearing, the court ruled that it would take judicial notice of the transcript except the portions which contained double hearsay.  Also, the court stated that Maldonado was required to testify at the fitness hearing "out of an abundance of caution."  We find this to be clear evidence that the court here, unlike the court in *J.G.*, did not merely take judicial notice of the entirety of the evidence at issue without considering its admissibility.  *Id.*  Here, the court made determinations regarding respondent's hearsay objections and clearly refused to consider portions it found to be hearsay.  The court also required Maldonado to testify at the fitness hearing and then considered his live testimony, not his testimony included in the transcript.

¶ 43    Similarly, respondent argues that portions of caseworker Payne's testimony contained in the transcript should not have been admitted by the court.  However, like Maldonado, Payne also testified at the parental fitness hearing and the court relied on his live testimony rather than the transcript.  Thus, consistent with the State's contention that even if we were to find that the court erroneously took notice of parts of the transcript, which we have not, any error would have been harmless, because the testimony presented in the transcript was also presented live at the fitness

hearing. Similar to the court's decision in *J.G.,* and explained more fully in our discussion below, we have found that there was certainly enough evidence of respondent's unfitness to support the court's ultimate finding even without considering the evidence respondent claims was improperly admitted. *Id.* Further, although respondent argues that the court improperly took judicial notice of the authentication of the Facebook photographs of respondent, we do not find her argument convincing due to the fact that respondent verified that it was, in fact, her in the two Facebook photographs at issue during her testimony at the May 21, 2014, hearing. Therefore, we do not find any improper judicial notice of the transcript by the court below.

¶ 44    Next, respondent asserts that the court allowed Nylani's statements to Payne to be improperly admitted at the fitness hearing. Respondent asserts that when Payne was being questioned regarding a conversation that he had with Nylani, respondent's counsel should have objected when the State asked Payne, "What did Nylani say?" because it elicited a hearsay response. Respondent also claims her counsel's failure to object to this question denied her effective assistance of counsel. The public guardian responds that Nylani's statements constitute admissions by a party opponent because Nylani is a party to the case. The State contends that Nylani's statements are admissible pursuant to section 2-18(4)(c) of the Juvenile Court Act of 1987 (705 ILCS 405/2-18(4)(c) (West 2012)).

¶ 45    We agree with the State. Pursuant to section 2-18(4)(c) of the Juvenile Court Act of 1987, "[p]revious statements made by the minor relating to any allegations of abuse or neglect shall be admissible in evidence. However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." *Id.* The statute allowing a minor's out-of-court statements relating to abuse or neglect to be admitted into evidence at civil adjudicatory proceedings to determine whether minor is abused or

21

neglected creates an exception to the general prohibition against hearsay. *In re A.P.*, 179 Ill. 2d 184, 196 (1997). Here, Nylani's statements at issue were made to Payne concerning whether she saw her "poppy" and whether Bruce had spent the night. Certainly, due to Bruce's status as a registered sex offender, these statements relate to allegations of abuse and neglect. Also, the court did not find Nylani's statements alone to be sufficient to support its finding of abuse and neglect, and ultimately, its finding of respondent's unfitness. We find that Nylani's statements fit squarely within the requirements of section 2-18(4)(c) of the Juvenile Court Act of 1987 and were therefore properly admitted. Likewise, contrary to respondent's assertion, there was no objection for respondent's counsel to make; thus, her ineffective assistance claim fails.

¶ 46    Based on the foregoing, we find that the trial court made proper evidentiary rulings, therefore, respondent was neither denied a fair hearing nor deprived of due process of law.

¶ 47                    Finding of Unfitness and Termination of Parental Rights

¶ 48    We next examine respondent's argument that the trial court's determination that she was unfit was against the manifest weight of the evidence. In a proceeding to terminate parental rights, the State must first prove by clear and convincing evidence the parent is unfit. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). In making such a determination, the court considers whether the parent's conduct falls within one or more of the unfitness grounds described in section 1(D) of the Act (750 ILCS 50/1(D) (West 2012)). A reviewing court will not disturb a trial court's unfitness finding unless it is against the manifest weight of the evidence. *In re D.D.*, 196 Ill. 2d 405, 417 (2001). "A decision regarding parental fitness is against the manifest weight of the evidence where the opposite conclusion is clearly the proper result." *Id.*

¶ 49    Under section 1(D)(m) of the Act, a parent may be found unfit if the parent fails "to make reasonable efforts to correct the conditions that were the basis for the removal of the child from

22

the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act." 750 ILCS 50/1(D)(m) (West 2012). Reasonable progress is an objective standard related to the steps the parent has taken toward the goal of reunification. *In re J.A.*, 316 Ill. App. 3d 553, 564 (2000).

¶ 50 Respondent argues that the record here clearly demonstrates that the opposite result was proper because there was insufficient evidence of her allowing Nylani to have unauthorized contact with Bruce. The public guardian responds that the court found by clear and convincing evidence that respondent failed to make reasonable progress toward reunification. The court found that the State had met its burden and proved by clear and convincing evidence that respondent was unfit under subsection (m) of section 1(D) of the Act, for failing to make reasonable efforts to correct the conditions that were the basis for Nylani's removal. 750 ILCS 50/1(D)(m) (West 2012). The court recognized that part of the reason Nylani was removed from her parents' custody was because Bruce was a registered sex offender. According to the trial court's decision, the fact that respondent "never manifest[ed] the insight about why she could not give access to her daughter by [Bruce]" was clear evidence that she had not made reasonable efforts toward reunification. We agree with this assessment by the trial court and hold that it's finding of unfitness is not against the manifest weight of the evidence. Although there was evidence that respondent attended most of the requisite services, there was significant evidence that she placed Nylani at risk of harm by continuing to allow Bruce access to Nylani. At the fitness hearing, there was substantial evidence presented that showed respondent's continued inability to comprehend the need to avoid any contact between Bruce and Nylani. Some of the persuasive evidence included: Nylani's statement during her victim sensitive interview, which

23

took place on April 9, 2014, that her "poppy" lives with respondent; the KinderCare letter, dated September 14, 2013, which stated that Nylani had been showing aggressive behavior and that "when [Nylani] comes from visits with [respondent], she is always talking about visiting and going to the park with her papi and mom and giving very detailed descriptions of the park"; Payne's testimony that he had concerns that there was contact between Nylani and Bruce during unsupervised visits because Nylani had used the term "poppy"; Payne's testimony that sometime after receiving the KinderCare letter, Nylani said that she saw "poppy"; and a DCFS letter, dated April 28, 2014, which reflected that respondent had been "indicated," meaning that "credible evidence of child abuse or neglect was found during this investigation," because respondent allowed a sex offender access to Nylani, creating a substantial risk of sexual abuse and injury to her health and welfare.

¶ 51    Although respondent makes much of the fact that a no-contact order was not yet in place during Payne's visit in December 2012, when Bruce visited the Warner address unannounced, we find that subsequent to the court's cessation of Nylani's contact with Bruce, the foregoing evidence amply shows that respondent continued to allow Bruce access to Nylani.  Further, at the time of Bruce's December 2012 visit, his contact with Nylani was limited to preplanned, supervised visits.  We agree with the court's finding of unfitness, because we, too, believe the evidence shows "a very heightened significant risk of harm that [respondent], for whatever reason, diminishes or does not understand why [Bruce] cannot have access to this child."  Based on the evidence presented at the fitness hearing, we hold that the court's finding that the State met its burden by clear and convincing evidence is not against the manifest weight of the evidence.

¶ 52     As a final matter, we note that the State argues that respondent did not make any argument regarding the court's finding that the termination of parental rights was in Nylani's best interest. For its part, the public guardian asserts that the court's finding that the termination of parental rights was in Nylani's best interest was not against the manifest weight of the evidence because the court considered Nylani's best interest with the factors required under section 1-3(4.05) of the Juvenile Court Act of 1987. 705 ILCS 405/1-3(4.05) (West 2012). We note that according to Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2013), "[p]oints not argued are waived and shall not be raised in the reply brief." A review of respondent's opening brief reveals that she did not present any argument regarding the court's finding that termination of parental rights was in Nylani's best interest. At the end of her opening brief, respondent asserts "[respondent] requests this *** court *** reverse the circuit's orders finding her to be an unfit parent and terminating her parental rights." Although respondent prays that we reverse the court's best interest determination, she does not present any argument or legal authority in support thereof. Therefore, we need not discuss this issue at length. We merely point out that the evidence presented at the best interest hearing overwhelmingly supported the court's finding that the termination of parental rights was in Nylani's best interest. Therefore, even if respondent had properly raised this issue on appeal, we would find that the court's determination was not against the manifest weight of the evidence.

¶ 53                                CONCLUSION

¶ 54     For the foregoing reasons, we affirm the trial court's judgment.

¶ 55     Affirmed.