NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190621-U

NO. 4-19-0621

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 3, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* A.J., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County |
| Petitioner-Appellee, | ) | No. 18JA68 |
| v. | ) | |
| Tyliah J., | ) | Honorable |
| | ) | Thomas E. Little, |
| Respondent-Appellant). | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices DeArmond and Cavanagh concurred in the judgment.

**ORDER**

¶ 1 *Held:* The appellate court affirmed the judgment of the trial court that terminated respondent's parental rights because the trial court's findings were not against the manifest weight of the evidence.

¶ 2 Respondent, Tyliah J., is the mother of A.J. (born October 2016). In August 2019, the trial court found respondent was an unfit parent, and in September 2019, it found termination of respondent's parental rights would be in the minor's best interests. Respondent appeals, arguing that the trial court's (1) fitness determination and (2) best-interest determination were against the manifest weight of the evidence. We disagree and affirm the trial court's judgment.

¶ 3 I. BACKGROUND

¶ 4 A. Procedural History

¶ 5 In March 2018, the State filed a petition for adjudication of wardship, alleging in relevant part that A.J. was a neglected minor as defined by the Juvenile Court Act of 1987 (Act)

in that she was not receiving the proper or necessary care recognized under State law as necessary for the minor's well-being. 705 ILCS 405/2-3(1)(a) (West 2016). Specifically, the petition alleged A.J. was found unattended in the hallway of a hotel, where respondent had left her for over three hours so respondent could attend a party. On the same day the petition was filed, the trial court conducted a shelter care hearing and placed temporary custody and guardianship with the guardianship administrator of the Department of Children and Family Services (DCFS).

¶ 6      In May 2018, the trial court conducted an adjudicatory hearing. Respondent stipulated to the allegations in count I, and the State dismissed the remaining counts. The court accepted the stipulation, found A.J. was a neglected minor, and found that a factual basis supported the stipulation.

¶ 7      Immediately following the adjudicatory hearing, the trial court conducted a dispositional hearing. The court entered a written order in which it found that it was in the best interest of A.J. and the public that A.J. be made a ward of the court and adjudicated a neglected minor. The court further found respondent unfit and unable for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline the minor, and it would be contrary to the minor's health, safety, and best interest to be in her custody. The court placed guardianship and custody with the guardianship administrator of DCFS. The written order further admonished respondent that she was required to cooperate with DCFS and "comply with the terms of the service plan and correct the conditions that require the minor to be in the care [*sic*] or [she] risk[s] termination of [her] parental rights."

¶ 8                    B. The Termination Hearing

¶ 9      In April 2019, the State filed a motion for termination of respondent's parental rights. The State alleged respondent was an unfit parent because she failed to (1) maintain a rea-

sonable degree of interest, concern, or responsibility as to A.J.'s welfare, (2) make reasonable efforts to correct the conditions which were the bases for the removal of A.J. during any nine-month period following the adjudication of neglect, and (3) make reasonable progress toward the return of A.J. within the nine-month periods of May 2018 to February 2019 and July 2018 to April 2019. 750 ILCS 50/1(D)(b), (m)(i),(ii) (West 2018).

¶ 10                                    1. *The Fitness Proceedings*

¶ 11            In August 2019, the trial court conducted the fitness portion of the termination hearing to address respondent's parental fitness. The State first presented the testimony of Lacey Smith, a child welfare advanced specialist with DCFS and the primary case worker since March 2018. Smith testified that A.J. was brought into care when respondent left her unattended in a hotel room to attend a party. The staff watched A.J. for a couple of hours before contacting the police. Smith explained that the initial service plan goals consisted of (1) parenting services, (2) substance abuse evaluation and services, (3) mental health treatment, (4) compliance with probation, and (5) an "independence goal, which included to have monthly contact with [Smith], and maintain stability."

¶ 12            Smith testified that respondent met with a parenting educator twice in May 2018 and had "not been compliant with parenting education since then." Respondent never completed a mental health assessment and failed to contact the mental health service provider. Respondent also never completed a substance abuse assessment or treatment and had never signed the releases of information to allow Smith to check treatment status.

¶ 13            Regarding stability and independence, Smith testified that respondent did not maintain monthly contact. Smith met with respondent a handful of times sporadically over the life of the case, mostly when respondent was in the county jail. Smith further testified that she

had great difficulty scheduling appointments with respondent and contacting her because respondent (1) "was not making herself available by telephone," (2) Smith did not know "what [respondent's] phone number was," and (3) respondent moved at one point but did not provide the new address.

¶ 14　Smith explained that when services or meetings were scheduled, respondent frequently did not call to cancel and simply did not show up without explanation. Smith reported that respondent had some transportation issues but refused to take the city bus when Smith offered a bus pass. Smith further stated that respondent was offered in-home mental health and parenting services through Youth Advocate, but respondent did not use them.

¶ 15　Smith also testified that respondent was in jail twice during the relevant time period, once in September 2018 and then again beginning in February 2019. Respondent was "currently incarcerated in the Illinois Department of Corrections" with an expected release date in December 2019. Smith opined that (1) respondent had not made an effort to engage in services and (2) would not "be able to meet the requirements for minimal parenting standards" within a six to nine-month period.

¶ 16　Christine Foster testified she was the parenting educator for the Youth Advocate program, which received the referral to provide respondent parenting education. Respondent was required to take weekly classes. Foster met with respondent twice in May 2018 and was able to complete a parenting assessment and go over the course curriculum with respondent. However, respondent did not appear for any further classes and did not respond to Foster's attempts to contact her.

¶ 17　Foster stated that during the initial appointment, she discussed with respondent whether respondent would like to attend classes at the office or in respondent's home. Foster ex-

plained that generally she attempts to coordinate a schedule with clients to provide parenting and mental health services either back-to-back or on visitation days. Foster testified respondent wanted to have classes in the office despite knowing they could be done at her home. Foster was not aware of any transportation issues that prevented respondent from attending. Foster continued to attempt to contact respondent and reengage her in services but was unsuccessful.

¶ 18          Vicki Brown testified that she works for Youth Advocate and supervised visits between A.J. and respondent. Brown stated 58 visits were offered to respondent of which respondent attended 10. Six of the visits occurred in May 2018, and two others occurred at the Macon County jail in March 2019. Brown testified that the visits went "[o]kay" and that A.J. interacted with respondent "no different[ly] than [Brown] being in the room and playing with her." Brown provided transportation for the visits and stated that respondent was not present to be picked up on 38 occasions for visitation.

¶ 19          Summer Henderson testified that she was a parenting educator at Youth Advocate assigned to the case beginning in September 2018. Henderson made multiple attempts to contact respondent and reengage her in services but was unsuccessful. Respondent never informed Henderson of a change in phone number or address and did not notify her that she was in jail.

¶ 20          Respondent did not present any evidence.

¶ 21          The trial court found that the State had proved all three allegations of unfitness listed in the petition—that is, that respondent (1) failed to maintain a reasonable degree of interest, (2) failed to make reasonable efforts, and (3) failed to make reasonable progress—by clear and convincing evidence. The court noted that respondent "made no efforts to engage or attempt to complete any services." Accordingly, the court found respondent was an unfit parent.

¶ 22                         2. *The Best-Interests Proceedings*

¶ 23        In September 2019, the trial court conducted proceedings regarding whether it was in A.J.'s best interests to terminate respondent's parental rights. Smith testified that (1) A.J. had been living with a foster family since July 2018, (2) she was "do[ing] really well in the foster home," and (3) the family was willing to adopt. Smith stated that A.J. was "very bonded" with her foster family, including the foster parents, their one natural child, and their three other foster children. A.J. called the foster parents "Mommy and Daddy" and was well integrated into the family's home life, their extended family, and community. Smith further stated that the foster parents were willing and able to provide for all of A.J.'s needs into adulthood, and she opined that it was in A.J.'s best interest to continue to live with her foster family.

¶ 24        Respondent did not present any evidence.

¶ 25        The trial court found that it was in A.J.'s best interests to terminate respondent's parental rights. The court stated it had considered all of the factors and "the ones that apply most clearly in this case would be this child's sense of attachment, where this child feels a sense of security, familiarity, continuity, the least disruptive placement alternative for the child as well as the child's need for permanence, including the child's need for stability and continuity of relationships with parent figures, with siblings, and other relatives." The court noted that (1) A.J. was "very bonded to her current foster parents" and their children, (2) "[s]he refers to them as Mommy and Daddy," and (3) the foster parents "expressed a strong desire to adopt this child." Further, A.J. was "thriving in this environment," and the foster parents were meeting all her needs and had been for over a year. Accordingly, the court found it was in A.J.'s best interest to terminate respondent's parental rights.

¶ 26        This appeal followed.

¶ 27                                II. ANALYSIS

¶ 28 Respondent appeals, arguing that the trial court's (1) fitness determination and (2) best-interest determination were against the manifest weight of the evidence. We disagree and affirm the trial court's judgment.

¶ 29        A. The Fitness Determination

¶ 30 Respondent argues the trial court's findings that the State proved all three grounds of unfitness by clear and convincing evidence were against the manifest weight of the evidence. It is well settled that "[a]s the grounds for unfitness are independent, the trial court's judgment may be affirmed if the evidence supports the finding of unfitness on any one of the alleged statutory grounds." *In re H.D.*, 343 Ill. App. 3d 483, 493, 797 N.E.2d 1112, 1120 (2003). Based on our review of the record, we conclude that the trial court's finding that respondent failed to make reasonable progress within the applicable nine-month period was not against the manifest weight of the evidence. Accordingly, we discuss only that finding.

¶ 31        1. *The Standard of Review*

¶ 32 A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make. *In re Richard H.*, 376 Ill. App. 3d 162, 165, 875 N.E.2d 1198, 1201 (2007). A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re D.D.*, 196 Ill. 2d 405, 417, 752 N.E.2d 1112, 1119 (2001). A decision is against the manifest weight of the evidence when the opposite conclusion is clearly the proper result. *In re Nylani M.*, 2016 IL App (1st) 152262, ¶ 48, 51 N.E.3d 1067.

¶ 33        2. *Reasonable Progress*

¶ 34 The State must prove unfitness as defined in section 1(D) of the Adoption Act by clear and convincing evidence. 750 ILCS 50/1(D) (West 2016); see also *D.D.*, 196 Ill. 2d at 417.

Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who fails to make "reasonable progress toward the return of the child" during any nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2016). The Illinois Supreme Court has held that "the benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child ***." *In re C.N.*, 196 Ill. 2d 181, 216-17, 752 N.E.2d 1030, 1050 (2001); see also *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17, 83 N.E.3d 485. Likewise, this court has defined "reasonable progress" as follows:

> " 'Reasonable progress' is an objective standard which exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future,* will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991).

¶ 35                              3. *The Trial Court's Finding in This Case*

¶ 36          Here, the State presented evidence that respondent never engaged in any of the required services. In fact, respondent did not complete a mental health assessment or a substance abuse assessment. Respondent also failed to show up for parenting classes and attended just 10 out of 58 visits that were offered. Of particular note, respondent did not engage in her services

- 8 -

ostensibly because of a refusal to take the bus. However, Smith and Foster informed respondent that she could receive parenting and mental health services in her home, which would have obviated the need for respondent to travel anywhere.

¶ 37     In addition, respondent failed to meet with Smith once a month and was extremely difficult to contact. Respondent did not answer phone calls or maintain up-to-date contact information. Respondent was rarely at the address she provided and at the time of the termination hearing, was in the Department of Corrections with an expected release date of December 2019. Accordingly, we conclude the trial court's determination that respondent failed to make reasonable progress toward the return of A.J. was not against the manifest weight of the evidence.

¶ 38                    B. The Best-Interest Determination

¶ 39                    1. *The Applicable Law and Standard of Review*

¶ 40     At the best-interest stage of a termination proceeding, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 290-91 (2009). In reaching a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the

risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072, 859 N.E.2d 123, 141 (2006); see also 705 ILCS 405/1-3(4.05) (West 2016).

¶ 41　　A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in the superior position to view the witnesses and judge their credibility. *Jay. H.*, 395 Ill. App. 3d at 1070. An appellate court "will not reverse the trial court's best-interest determination unless it was against the manifest weight of the evidence." *Id.* at 1071. A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the trial court should have reached the opposite result. *Id.*

¶ 42　　　　　　　　　　　　　　　2. *This Case*

¶ 43　　The trial court repeatedly noted A.J. was doing extremely well in her placement with her foster family. She had a strong bond with her foster parents, called them "Mommy and Daddy," and had a strong bond with her foster siblings. A.J. had been living with the foster family for over a year, nearly half of her life, and that family was meeting all her needs. Further, the foster parents expressed a strong desire to adopt A.J. The court stated the factors that stuck out most included the child's sense of attachment, security, and continuity of affection and the need for stability and continuity of relationships. The evidence presented as well as the trial court's findings support this conclusion. Accordingly, we conclude the trial court's finding that it was in A.J.'s best interest to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 44　　　　　　　　　　　　　　III. CONCLUSION

¶ 45　　For the reasons stated, we affirm the trial court's judgment.

¶ 46　　Affirmed.