# ILLINOIS OFFICIAL REPORTS

---

### *In re J.C.*, 2011 IL App (1st) 111374

---

| | |
|---|---|
| Appellate Court Caption | *In re* J.C., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Iola H., Respondent-Appellant). |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-1374 |
| Rule 23 Order filed<br>Rule 23 Order withdrawn<br>Opinion filed | October 3, 2011<br><br>November 16, 2011<br>November 18, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The judgment of the trial court finding the minor to be physically abused and exposed to a substantial risk of physical injury is affirmed over biological mother's contention that the court's ruling was against the manifest weight of the evidence. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-JA-392; the Hon. Nicholas Geanopoulos, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Abishi C. Cunningham, Public Defender, of Chicago (Lester Finkle, Assistant Public Defender, and Chelsea Gregory, law student, of counsel), for appellant. |
|---|---|
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan Spellberg, Mary Needham, and Nancy Kisicki, Assistant State's Attorneys, of counsel), for the People. |
| | Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Mary Brigid Hayes, of counsel), guardian *ad litem*. |
| Panel | JUSTICE CAHILL delivered the judgment of the court, with opinion. Presiding Justice R. Gordon and Justice Garcia concurred in the judgment and opinion. |

## OPINION

¶ 1    Respondent, Iola H., is the biological mother of J.C., a minor. She appeals from a trial court adjudication order finding J.C. was physically abused and that he was abused because of a substantial risk of physical injury under the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(2)(i), (2)(ii) (West 2010)). We affirm.

¶ 2    On March 10, 2009, when J.C. was 22 months old, he was diagnosed at Loyola University Medical Center (Loyola) with second- and third-degree burns to about 30% of his body. Because doctors found J.C.'s life-threatening injuries to be the result of child abuse and since respondent had delayed in seeking medical attention for J.C., hospital personnel contacted the Illinois Department of Children and Family Services (DCFS). DCFS took protective custody of J.C. on May 4, 2009, and contacted police. Respondent was later charged with aggravated battery.

¶ 3    On May 5, 2009, the State filed a petition for adjudication of wardship against J.C., alleging respondent: had one earlier indicated report for second-degree burns to J.C. resulting from neglect; had an earlier "intact" case opened for her and closed on April 30, 2008; and had been charged with aggravated battery of J.C. and was currently incarcerated. The State also alleged J.C. was neglected because of a lack of care and because his environment was injurious to his welfare (705 ILCS 405/2-3(1)(a), (1)(b) (West 2010)). The State also alleged respondent physically abused J.C. and that he was abused because of a substantial risk of physical injury (705 ILCS 405/2-3(2)(i), (2)(ii) (West 2010)).

¶ 4    The court held an adjudicatory hearing on April 19, 2011. Barry Bennett, the manager of social work and case management at Loyola, testified at the hearing that he first

encountered J.C. in November 2007, when J.C. was admitted to the hospital for a second-degree burn to about 10% of his body. In assessing the cause of J.C.'s injury, Bennett interviewed respondent. Respondent told Bennet that while she was bathing J.C. in the bathroom sink, she left the bathroom to get a towel. Respondent left the water running while she retrieved the towel. Before respondent returned to the bathroom, the telephone rang. Respondent answered the phone and heard J.C. start to cry. She returned to the bathroom and noticed that the water was hot. She lifted J.C. out of the sink and began to dry him off with a towel. Respondent noticed that J.C.'s skin was peeling and blistering. Respondent called 911 and took J.C. to the emergency room.

¶ 5 On March 10, 2009, the day after J.C.'s second injury, Bennett interviewed respondent, respondent's mother and J.C.'s father. Respondent told Bennett that while she was in the shower with J.C., rinsing him with a handheld showerhead, the water suddenly turned hot. J.C. began to scream and respondent's mother was able to comfort him. Neither respondent nor her mother noticed blisters or burns on J.C.'s body at the time of the injury. Respondent put J.C. to bed and he fell asleep. The next morning, respondent saw burns on J.C.'s body and took him to the Ingalls Memorial Hospital emergency room. Later that day, J.C. was transferred to Loyola, where his injuries were diagnosed as critical and life-threatening. Respondent told Bennett that she had not been burned at the same time.

¶ 6 Bennett also testified that he worked as part of a team in determining whether J.C.'s injuries were consistent with respondent's explanation of what happened. Bennett said he was uncomfortable offering a forensic opinion about how J.C.'s injuries occurred but that the injuries were not inconsistent with what could happen with a handheld showerhead. He said J.C.'s injuries were not the result of immersion into hot water. Bennett also said that he was concerned about the amount of time it took respondent to bring J.C. to the hospital after his injury.

¶ 7 Tamara Williams Brady, a DCFS child protection service investigator, testified that she was assigned to J.C.'s case in March 2009. During her investigation, Brady learned that there was one earlier indicated report for J.C.'s family. The report was indicated against respondent for "burns by neglect."

¶ 8 Brady spoke with respondent at the Harvey police station on March 11, 2009. Respondent told Brady a story about how J.C. was injured substantially similar to what she told Bennett. Respondent added that J.C. was facing her in the shower and as she rinsed him off with a handheld showerhead, the water suddenly turned hot. Respondent said she dropped the showerhead and the water splashed everywhere, burning J.C. Respondent told Brady she was not burned by the water. After the injury, respondent took J.C. to her mother's house. Respondent said she did not call 911 or the hospital for medical advice. Respondent's mother called a pharmacy and was advised to buy antibiotic cream. Respondent bought the cream but did not apply it to J.C. because he had no blisters on his body. About 9 p.m., respondent returned to her own home and put J.C. to bed, where he stayed until the next morning. Respondent said J.C. did not cry during the night and showed no signs of pain. The next morning, March 10, 2009, respondent noticed two small blisters on J.C.'s face. She also noticed that J.C.'s skin was peeling. Respondent later noticed that blisters began to form on J.C.'s back and buttocks and that these, too, began to peel. Respondent then took J.C. to the

hospital.

¶ 9      Brady also testified that as part of her investigation, she spoke with J.C.'s father, who told her that he was in respondent's home when J.C. was burned. He said that after respondent and J.C. had been in the shower for a short time, respondent screamed. Respondent's mother ran into the bathroom. The father said respondent and her mother took J.C. out of the shower and wrapped him in a towel. The father said he did not see that J.C. was injured. He did not call 911, the hospital or inquire about medical treatment. The father also told Brady that he checked on J.C. about every 20 minutes during the night until about 1:30 a.m. The next morning, J.C.'s father went to work without checking on J.C. He received a telephone call from respondent later that day and learned that J.C. had blisters on his body and was in the hospital.

¶ 10      Brady further testified that on March 11, 2009, she, along with respondent's mother and a detective, went to respondent's home and tested the temperature of the water in the shower. Brady said that when the hot water was run alone in the shower, it reached a temperature of 145 degrees Fahrenheit. When the hot and cold water were run simultaneously, the water reached a temperature of 88 degrees Fahrenheit. Brady said that the handheld showerhead never became too hot to handle even when only hot water was running through it.

¶ 11      The State admitted into evidence numerous exhibits, including J.C.'s medical records, pictures of J.C.'s injuries and records from Children's Home and Aid society concerning the services offered to J.C.'s family from January 2008 through April 2008. The State published excerpts of the exhibits to the court. J.C.'s medical records characterized his injuries as severe and his status as critical. The records show that on the morning of March 10, 2009, he was given two doses of morphine for pain. The records also show that J.C. had a fever and was severely dehydrated. A social work pediatric initial assessment dated March 10, 2009, notes that J.C. was intubated, sedated and in critical condition due in part to respondent's delay in bringing him to the hospital. A March 25, 2009, burn progress note shows that J.C. was on full mechanical ventilatory support and nutritional support. Doctors' notes show that J.C. had a greatly increased mortality because of his late presentation for treatment–18 hours after being burned. Doctors' notes also show that J.C.'s injuries were considered to be nonaccidental in nature and that he was the victim of physical abuse.

¶ 12      After hearing closing arguments from the parties, the court found J.C. was physically abused and that he was neglected. The court noted that respondent's explanation of how J.C. suffered his injuries was incredible given the severe nature of his burns. The court pointed out that it was unlikely that such extensive burns would result from J.C. being accidentally sprayed with hot water while taking a shower. The court also pointed out that it was unlikely that J.C. could have been burned to such an extent while respondent suffered no injury despite being in the shower with him. In announcing its ruling, the court noted it was not finding that the abuse was intentional but that the State had shown by a preponderance of evidence that J.C. was abused and that respondent was the perpetrator. The court also noted that respondent's delay in taking J.C. to the hospital was unreasonable given the extent of his injuries and that he must have been in pain, as evidenced by the two doses of morphine he was given on his arrival at the hospital.

¶ 13    On April 19, 2011, the trial court entered an adjudication order, finding J.C. was neglected because of a lack of care and because his environment was injurious to his welfare under the Act (705 ILCS 405/2-3(1)(a), (1)(b) (West 2010)). The court also found that J.C. was physically abused and that he was abused because of a substantial risk of physical injury under the Act (705 ILCS 405/2-3(2)(i), (2)(ii) West 2010)).

¶ 14    The court held a disposition and permanency hearing on April 19, 2011. At the hearing, Johnyce Ware, a case coordinator from Illinois Mentor (the agency), testified that J.C. was assigned to the agency and was currently in a nonrelative specialized foster home. Ware said that J.C. was required to wear a compression suit covering his head, chest, arm and portions of his legs for 23 hours a day as a result of his injuries. He was also exhibiting troubling behavior such as head-banging, and he suffered from frustration and anxiety. Ware said respondent did not have visitation rights to J.C. and recommended that this arrangement continue because J.C. was recently discharged from therapy.

¶ 15    Ware also testified that the agency assessed respondent and determined that she was in need of individual therapy, parenting classes and parenting coaching to avoid termination of her parental rights. Ware said respondent was not currently engaged in the recommended services because she was in custody, awaiting trial on charges of aggravated battery.

¶ 16    On April 19, 2011, the court entered a disposition order, finding that it was in the best interest of J.C. that he be adjudged a ward of the court. The court appointed D. Jean Ortega-Piron, DCFS's guardianship administrator, as J.C.'s guardian with the right to place him. The court also found that respondent was unable for some reason other than financial circumstances to care for, protect, train or discipline J.C. and that it was in J.C.'s best interest to remove him from respondent's custody. On the same date, the court entered a permanency order with the goal of return home within 12 months. The order noted that respondent had not made substantial progress toward this goal.

¶ 17    Respondent appeals, arguing that the trial court's findings that J.C. was physically abused and that the abuse created a substantial risk of physical injury were against the manifest weight of the evidence. A trial court's finding of neglect or abuse will not be reversed unless it is against the manifest weight of the evidence. *In re Faith B.*, 216 Ill. 2d 1, 13-14, 832 N.E.2d 152 (2005). A finding is against the manifest weight of the evidence if the opposite conclusion is " 'clearly evident.' " *In re Faith B.*, 216 Ill. 2d at 13-14 (quoting *In re Arthur H.*, 212 Ill. 2d 441, 464, 819 N.E.2d 734 (2004)). A court need not find specific intent to harm to find physical abuse, but it cannot find abuse if the injury happened accidentally. *In re Marcus H.*, 297 Ill. App. 3d 1089, 1098, 697 N.E.2d 862 (1998).

¶ 18    Respondent contends that the trial court erred in concluding that J.C.'s injury was not accidental. She claims the record shows that she was also burned in the shower and that no medical testimony contradicts her account of how the injury occurred. Respondent maintains that under these circumstances the State did not prove beyond a reasonable doubt that J.C.'s injury was not accidental.

¶ 19    We first note that the State was not required to prove beyond a reasonable doubt that J.C.'s injury was not accidental. A hearing on a petition for adjudication of wardship is civil in nature and a finding of abuse or neglect needs only to be supported by a preponderance

of the evidence. 705 ILCS 405/2-18(1) (West 2010); *In re A.P.*, 179 Ill. 2d 184, 188, 688 N.E.2d 642 (1997). It is the State's burden to prove abuse alleged in the petition by a preponderance of the evidence, which is the amount of evidence that leads a trier of fact to find that the abuse is more probable than not. *In re K.G.*, 288 Ill. App. 3d 728, 735, 682 N.E.2d 95 (1997).

¶ 20 Here, after examining the record, we cannot say that the trial court erred in finding the State met its burden and proved J.C. was physically abused. The evidence presented at the adjudication hearing showed the severe and life-threatening nature of J.C.'s injuries. He had sustained second- and third-degree burns to about 30% of his body. Contrary to respondent's argument that no medical testimony contradicts her account of how the injury occurred, J.C.'s medical records include doctors' notes diagnosing his injuries as nonaccidental and him as a victim of physical abuse. Although respondent argued J.C.'s injuries could have been accidental, she presented no evidence or expert testimony to support her position. See *In re R.R.*, 409 Ill. App. 3d 1041, 1046, 949 N.E.2d 209 (2011). We note that the focus of an adjudicatory hearing is not on whether the respondent abused the minor but rather on whether the minor was abused. See *Arthur H.*, 212 Ill. 2d at 467. Given the extent of J.C.'s injuries combined with the doctors' notes diagnosing them as nonaccidental, we agree with the court's finding that the State showed by a preponderance of the evidence that J.C. was physically abused.

¶ 21 We are unpersuaded by respondent's argument that, when determining the nature of J.C.'s injuries, the court failed to consider that she was injured in the shower with J.C. Respondent claims that the court's reliance on its mistaken belief that she did not suffer an injury ignored the evidence presented. Although respondent argues in this court that she suffered a burn on her chest from the incident, this argument was not presented to the trial court nor was there evidence to support it. Instead, the record shows that respondent was not injured. Bennett and Brady testified that respondent told them she was not burned in the shower when the water turned hot. We cannot say the court erred in concluding that J.C.'s injuries were not accidental on this basis.

¶ 22 Respondent next contends that the trial court erred in concluding that J.C. was abused because of a substantial risk of injury because J.C. was injured during a relatively safe activity: showering. Respondent overlooks that the substantial risk of injury was not created by the shower but rather by respondent's delay in taking J.C. to the hospital after he was injured. To the extent that respondent argues that the delay in taking J.C. to the hospital was accidental because "a reasonable person would not have realized that the burns required immediate care" and she "made a good[-]faith mistake about whether J.C. required immediate care," we reject these arguments.

¶ 23 A parent has committed abuse if the parent created "a substantial risk of physical injury to [the] minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function." 705 ILCS 405/2-3(2)(ii) (West 2010). As mentioned, the focus of the adjudicatory hearing was not on whether respondent abused J.C. but, rather, on whether J.C. was abused. *Arthur H.*, 212 Ill. 2d at 467.

¶ 24 Here, the record shows that as a result of respondent's delay in seeking medical attention for J.C.'s injuries, she created a substantial risk of physical injury to him. Doctors' notes accompanying J.C.'s medical records show that, due in part to respondent's delay in taking J.C. to the hospital, he was severely dehydrated and in critical condition and needed to be intubated and sedated. The notes also show that J.C. was at a greater risk for not surviving his injuries because respondent delayed in taking him to the hospital. Given the extent of J.C. injuries, we are unpersuaded by respondent's argument that a reasonable person would not have realized that J.C.'s burns required immediate care.

¶ 25 We are likewise unpersuaded by respondent's argument that she made a good-faith mistake about whether J.C. required immediate care. We note that in 2007, J.C. was burned under nearly identical circumstances. At that time, respondent exercised reasonable care by calling 911 and seeking immediate medical attention for J.C. Given this experience and the severe nature of J.C.'s injuries, respondent should have known the importance of seeking immediate medical attention for him. This is especially so where J.C.'s current burn was far more severe than the one he suffered in 2007. The court did not err in concluding J.C. was abused because of a substantial risk of physical injury.

¶ 26 We affirm the judgment of the circuit court of Cook County.

¶ 27 Affirmed.