2026 IL App (1st) 250207

Third Division
June 3, 2026

No. 1-25-0207

| | | |
|---|---|---|
| *In re* Z.I. and K.G., | ) | Appeal from the Circuit Court |
|     Minors-Appellees | ) | of Cook County. |
| | ) | |
| (The People of the State of Illinois, | ) | |
|     Petitioner-Appellee, | ) | Nos.   24 JA 300 |
| | ) |          24 JA 301 |
| v. | ) | |
| | ) | The Honorable |
| Yanicee M., | ) | Demetrios G. Kottaras, |
|     Respondent-Appellant). | ) | Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court, with opinion.
Presiding Justice Martin and Justice Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1      Respondent Yanicee M. is the natural mother of minors K.G., born on August 10, 2017, and Z.I., born on January 27, 2024. In a December 19, 2024, order following a continued hearing, the juvenile court adjudicated both K.G. and Z.I. to be abused and neglected under the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3 (West 2024)). On January 6, 2025, a dispositional hearing followed wherein the juvenile court found respondent unable to care for, protect, train, or discipline the minor children. The juvenile court terminated temporary custody and appointed a guardian with the right to placement.

¶ 2      Respondent now brings this appeal of the adjudication order, declining to challenge the dispositional ruling or proceedings or the overall sufficiency of the evidence. For the following reasons, we affirm the adjudication order.

¶ 3                                          BACKGROUND

¶ 4            The minors in this appeal are K.G., an eight-year-old girl born in 2017, and Z.I., a two-year-old girl born in 2024. Respondent is the natural mother of both minors. K.G.'s natural father is Kh. G., and Z.I.'s natural father is K.I. Neither father is a party to this appeal.

¶ 5            The Illinois Department of Children and Family Services (DCFS) became involved in this case as a result of an April 10, 2024, incident in which respondent brought Z.I., then two months old, to the University of Chicago Comer Children's Hospital (Comer) for injuries related to a report of a fall from a bed at the minor's maternal grandmother's residence. Hospital staff noted a bruising pattern on Z.I.'s right cheek with linear marks, as well as a bruise and scratch outside the left eye, which had a subconjunctival hemorrhage (a blood vessel rupture which causes a red spot in the white part of the eye), and further bruising on the jaw. After clinicians were unable to draw blood from Z.I. for lab testing, respondent and K.I. left the hospital with Z.I. A hospital social worker was at this time notified and made a plan with the attending physician to notify DCFS if respondent did not return with Z.I. within 30 minutes. They also noted concern that Z.I.'s injuries were consistent with nonaccidental trauma. After numerous unanswered calls to both respondent and K.I., respondent eventually answered and returned with Z.I. to the hospital. DCFS, however, had been already notified as more than an hour had passed. Upon their return, respondent and K.I. spoke to DCFS. Z.I. was discharged that evening after Z.I. received a normal head CT scan and preliminary skeletal survey.

¶ 6            The following morning, April 11, 2024, the family was called back to the hospital as a radiologist had noted on a subsequent reading of Z.I.'s skeletal survey multiple bilateral rib fractures in various stages of healing. Combined with the subconjunctival hemorrhage in Z.I.'s

left eye and her patterned facial bruising, the nature of these injuries caused the hospital staff to once again notify DCFS and the hospital social worker. The hospital staff also requested a consultation from the hospital's Child Advocacy and Protective Services (CAPS) team, which was completed on April 12. On this same date, DCFS took protective custody of Z.I. and K.G. On April 16, 2024, the State filed petitions for adjudication of wardship.

¶ 7    The petition for K.G. alleged that she was neglected pursuant to section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)) as a minor whose environment was injurious to her welfare and abused pursuant to section 2-3(2)(ii) of the Act (*id.* § 2-3(2)(ii)) in that her parent or another individual in her same family or household created a substantial risk of physical injury to her. The petition for Z.I. contained the same section 2-3(1)(b) and 2-3(2)(ii) allegations and further alleged abuse pursuant to section 2-3(2)(i) of the Act (*id.* § 2-3(2)(i)) for infliction of physical injury by nonaccidental means which caused impairment. The facts presented in support of the petition for Z.I. included her presentation at Comer with multiple bilateral healing rib fractures in different stages of healing, subconjunctival hemorrhage, and patterned facial bruising. The petition also alleged that the parents had no plausible explanation for Z.I.'s injuries and that the hospital personnel believed Z.I.'s injuries were due to physical abuse.

¶ 8    The juvenile court conducted a temporary custody hearing and found probable cause that both minors were abused and neglected. Immediate and urgent necessity was found to exist to support removal from the home for both minors according to temporary custody orders entered on April 18, 2024, which granted the DCFS guardianship administrator temporary custody with the right to consent to major medical care and placement authority.

¶ 9                                           *Adjudication Hearing*

¶ 10            An adjudication hearing commenced on December 17, 2024, however, prior to adjudication, the juvenile court heard respondent's motion for continuance, which had been filed five days prior on December 12, 2024. In the motion, respondent's counsel stated that he had "undertaken to consult with an expert in anticipation of trial and *** made efforts to complete this consultation in a timely manner, to determine if the expert's testimony will be necessary for [respondent] to present her defense, and otherwise to be prepared." The motion revealed that "despite counsel's best efforts to secure a consultation earlier," a "substantive consultation" with this unnamed potential expert had been scheduled for December 16, 2024—the day before the adjudication hearing. The motion also explained counsel's belief that the State would seek to introduce hospital records at adjudication containing medical opinions, terminology, and conclusions regarding Z.I.'s injuries, thereby rendering a medical expert "potentially material and necessary." To address this, respondent's counsel requested "further time to consult the expert and prepare a trial strategy."

¶ 11            Respondent's counsel attached an affidavit in support of the motion, detailing his efforts to consult with a potential expert since July 2024, his leave of absence from the public defender's office from mid-September to early December 2024, his scheduling of a consultation with the expert in November 2024, the expert's subsequent cancellation before that consultation, and the expert's rescheduling the consultation to December 16, 2024—the day before the adjudication hearing was set to commence. Respondent's counsel wrote that, "[a]s of the time of the filing of this motion, counsel has not heard back from the potential expert" in response to his inquiry into the expert's availability to testify as a witness at adjudication.

¶ 12            At the hearing, respondent's counsel revealed that Dr. Evan Matshes was the expert witness he had discussed in the motion and affidavit and that he had "made efforts to consult with him; and then to secure his report and to disclose him the way you're supposed to do in time for a trial today," but that "[d]espite [counsel's] efforts that wasn't able to happen." Counsel argued that he believed Dr. Matshes was a material witness, but that he needed to speak with Dr. Matshes again to confirm the materiality of his testimony. Respondent's counsel also argued that "pursuant to [respondent's] due process rights to confront the witnesses," the juvenile court should grant a continuance to allow respondent a chance to cross-examine Dr. Kimberly Schwartz, an attending physician of the Comer CAPS team who had evaluated Z.I. at the hospital and found her injuries to be consistent with multiple episodes of physical abuse. Lastly, respondent's counsel argued that the medical records relating to Dr. Schwartz's consultation were inadmissible hearsay, outside the scope of the Act's business record exception, as they were advanced to prove a legal conclusion of abuse or neglect.

¶ 13            In response, the State noted that respondent had been in receipt of the Comer medical records since June 2024, supplemented with radiology records on September 5, 2024, and additional requested records on November 7, 2024. The State further noted that respondent's counsel had failed to disclose the expert's identity at the August 2024 case management conference (CMC) and subsequently failed to request leave of court to amend the resulting CMC order or add another expert.

¶ 14            Respondent's counsel argued that he had transmitted the necessary case materials to the State within the discovery period, but he had not at that time possessed the ability to determine whether this potential expert was material, contending that, "when [Dr. Matshes]

was supposed to get this to me in late November still within the timeline to amend the [CMC], he cancelled on me unexpectedly."

¶ 15    The juvenile court inquired whether respondent's counsel had amended or sought to supplement the CMC order to include Dr. Matshes, and respondent's counsel answered, "I would be seeking to do that today." Respondent's counsel further requested a Health Insurance Portability and Accountability Act order for discovery of genetic records taken by the Mayo Clinic at the request of respondent, who had suspected that Z.I. may have a genetic predisposition to osteogenesis imperfecta, which could explain a susceptibility to bone fractures. The court then interjected, "So on the day of trial you're asking for a continuance announcing that you have an expert. Has your expert prepared a report?" Respondent's counsel answered in the negative, and the court admonished respondent's counsel for failing to properly request to supplement or amend the CMC order, secure an expert report before the date of the adjudication hearing, or file an emergency motion for continuance, despite knowing that there was a possibility he would solicit this witness's testimony for the hearing.

¶ 16    Respondent's counsel acknowledged that co-counsel at the public defender's office had been assisting with the case while he was out on leave and that the subject of the expert "may have been discussed" in his absence. Respondent's counsel also acknowledged that he had been aware of the possibility of Dr. Matshes's expert testimony since November but had chosen not to file a motion or emergency motion for continuance at that time.

¶ 17    The court denied the motion for continuance, stating:

"I believe you have had more than ample opportunities to seek a continuance if in fact you so chose to have this expert. *** I'm looking at how this was handled and your

6

approach; and I do not find that your methodology or your protocol was in a practical manner.

You had more than ample opportunities to disclose an expert; and, without a report to seek a continuance prior to the day of trial and by telling me that this was filed a few days ago, I don't believe this is adequate notice and subpoenaing the expert of the State that you believe would be necessary when the State chose to go forward with documents that have been properly certified and delegated when there was no notice that they would in any way be challenged[.]"

¶ 18    The court later requested that respondent's counsel make what was an apparent informal offer of proof for the motion for continuance. Counsel stated that Dr. Matshes would testify that he was a forensic pathologist and licensed to practice medicine and that he did not believe there to be a reasonable degree of medical certainty in the records to draw a conclusion of physical abuse as Dr. Schwartz had for Z.I. Specifically, respondent's counsel stated that Dr. Matshes would call attention to the CAPS consultation note's lack of "differential diagnoses" to rule out potential accidental causes of Z.I.'s injuries, such as "bone disease, metabolic conditions, [and] genetic conditions for circumstances like birth trauma."

¶ 19    The State then presented the medical evidence taken by Dr. Schwartz as "uncontroverted medical evidence," as it argued was found permissible to form a basis for an adjudicatory finding of abuse and neglect in *In re J.C.*, 2011 IL App (1st) 111374, ¶¶ 11, 20.

¶ 20    Ruling that "[t]he prior finding is to stand" on respondent's motion for continuance, the juvenile court then proceeded to the adjudication hearing. The State called as its first witnesses Adrienne Hudson and Mesha Chandler, both DCFS workers assigned to the case.

¶ 21         Hudson testified that in April 2024 she was employed as an investigator with DCFS's Division of Child Protection (DCP), and she was assigned the Z.I./K.G. case on April 10, 2024, when respondent had first brought Z.I. to Comer. Hudson stated that the case was first assigned to her "for cuts, welts, and bruises" on the two-month-old child, Z.I., and that "the bruising were [*sic*] inconsistent with the, another story of the incident." Hudson testified that the additional concern regarding Z.I.'s nine unexplained bone fractures was added to her investigation on April 11, 2024.

¶ 22         Hudson visited Z.I. and respondent at Comer Hospital on April 10, explained the reasons for her involvement, and elicited a timeline of events leading up to Z.I.'s injuries from respondent. Respondent stated to Hudson that she was at her maternal grandmother's home on April 9, 2024, and was cooking in the kitchen with the grandmother with Z.I. resting in her car seat in the same room, when K.G., unbeknownst to respondent, removed her sister from her seat and carried her upstairs to the bedroom. Respondent then reported hearing a thud, prompting her to run upstairs where she observed K.G. holding a crying Z.I. In respondent's account to Hudson, K.G. then explained that she had placed Z.I. on the edge of the bed, from which she had proceeded to fall. Respondent also informed Hudson that K.G. had on previous occasions picked up Z.I., and that the six-year-old had expressed wanting to help with her baby sister. Respondent told Hudson that she did not observe any bruises or marks on Z.I. that day, but on the following day, April 10, she noticed bruising on Z.I.'s cheek and brought her to Comer.

¶ 23         Respondent told Hudson that she became upset with the hospital staff's treatment of Z.I., noting that "they were poking the baby" and "taking too long." She then left Comer, dropped K.G. at her maternal grandmother's home, and reportedly had intentions to take Z.I.

to another hospital. Respondent told Hudson that she later returned to Comer with Z.I. after being instructed to do so.

¶ 24　　After this point, Hudson met with respondent and Z.I. at the hospital and observed bruising on Z.I.'s left and right cheeks and a scratch near the corner of Z.I.'s left eye. Hudson also testified that she conversed with K.G. over the phone the following day, April 11. K.G. informed Hudson that on April 9, 2024, she had taken Z.I. out of her car seat in the kitchen and brought her upstairs, laid her on the edge of the bed next to a pillow, and went to use the bathroom. As she exited the bathroom, she observed Z.I. lying on the floor on her back. K.G. then picked Z.I. up, at which point respondent entered the room.

¶ 25　　Hudson met K.G. in person on April 11, 2024, and requested she repeat her account of what transpired on April 9. K.G.'s account was consistent with the one she had transmitted over the phone, except that she also noted this time that her aunt had entered the room at the same time as respondent after Z.I. fell from the bed.

¶ 26　　In response to cross-examination, Hudson testified that she inquired whether K.G. felt afraid of her mother, and K.G. answered that she did not. Hudson also testified that she did not have concerns regarding K.G.'s physical condition, behavior, or appearance at the time of this conversation. On redirect examination, the State inquired whether, based on Hudson's 15 years of DCP experience, she had concern that a six-year-old was able to take a two-and-a-half-month-old infant out of her car seat and upstairs without going noticed. Hudson answered that she was indeed concerned that no one had noticed when K.G. removed Z.I. from her car seat.

¶ 27　　The State then called Chandler, another DCP worker employed at DCFS in April 2024. Chandler testified that she was assigned to the investigation around April 11, 2024, picking up after Hudson. After reviewing Hudson's notes, Chandler spoke to respondent and explained

the need for the DCFS investigation. Chandler heard an account of events from respondent, which was largely consistent with the account she had provided Hudson. Respondent also explained to Chandler why she had left the hospital prematurely on April 10, telling Chandler that Z.I. "was in distress from constantly getting poked with needles." Chandler was the DCFS worker who instructed respondent to return to Comer with Z.I., and she testified that respondent had reported that she was at a funeral at the time of her call. Chandler testified that respondent disagreed with her at first and maintained that she was going to bring Z.I. to another hospital, but she eventually agreed to return to Comer.

¶ 28        Chandler met with respondent in person on April 12, 2024. Respondent again related to Chandler her account of the events of April 9—that she was cooking in the kitchen when K.G. removed Z.I. from her car seat, took her upstairs, lay her on the bed, and Z.I. then fell from the bed. After hearing a "thud," respondent ran upstairs and found the infant on the floor as K.G. emerged from the bathroom. Respondent informed Chandler that K.G. "always picks [Z.I.] up," and that she previously instructed K.G. against it. Chandler also met with K.G. on April 12, 2024, and K.G.'s account was similar to that which she provided Hudson. K.G. reported feeling safe with her mother and demonstrated to Chandler with a baby doll how she carried Z.I. up the stairs on April 9. She told Chandler that she loved playing with Z.I. and that respondent had previously instructed her not to pick up her sister.

¶ 29        After Chandler staffed the case with her supervisor, a decision was made to take protective custody of both girls due to the unexplained multiple rib fractures revealed on Z.I.'s exams on April 11, 2024.

¶ 30        Following Chandler's testimony, the State requested admission of three documentary exhibits, the first of which contained certified medical records from Z.I.'s treatment at Comer.

10

Respondent's counsel objected to the exhibits' admission to the extent that they would be used "to support a medical opinion or diagnosis contained therein." Respondent's counsel read from the section of the Act that authorizes this type of evidence, section 2-18(4)(a), which creates a juvenile law equivalent of the business record hearsay exception. The Act, respondent's counsel argued, allowed for the admission of medical notes which "indicate factual conditions that could be observed when a certain examination took place and how a body part or something appeared," but not for the purpose of providing substantive support for "medical conclusions, opinions, and diagnoses." The State contested this interpretation, maintaining that the records were properly certified and fell under a "regularly and routinely" cited exception of the Act for "medical records that have medical information in them regarding the relevance of the case and the treatment of the minor." The court overruled respondent's objection and admitted the exhibit into evidence. The second and third exhibits, containing Comer medical records for K.G. and subsequent Comer medical records for Z.I., were admitted without objection.

¶ 31    The State then published excerpts of a "Child Advocacy Protection Team Telephone Note" authored by Dr. Schwartz at 12:37 p.m. on April 24, 2024. Respondent's counsel renewed her pretrial objection to this evidence, arguing that the "due process of law protected by the fifteenth amendment [*sic*] of the United States Constitution and Article (1) of the Illinois Constitution includes the right to confront the witness against you in civil proceedings." The court overruled the objection, noting first that this was "not a criminal matter," and second that "all parties have the opportunity and subpoena power to bring in any and all witnesses that have been disclosed on the [CMC]."

¶ 32    Dr. Schwartz's note explained, contrary to a suggestion from respondent, that the bilateral rib fractures observed on Z.I.'s scans were not consistent with birth injuries due to prolonged delivery, as Z.I. was already 10 weeks old at the time of her presentation at Comer, and any birth-related rib fractures would have been fully healed by 6 to 8 weeks. "Furthermore," the note read, "I attempted to explain that subconjunctival hemorrhage is not seen with constipation with babies. It is a concerning injury." Additionally, Dr. Schwartz's note observed that respondent "continues to share belief that the spiraling parallel lines that extended around [Z.I.'s] face were not a partial slap mark as I had indicated but came from her hardwood floors." The note continued:

> "I explained [to respondent] that, when a fast moving, flexible object such as a hand or wire or belt contacts skin, it sometimes breaks the capillaries around the points of impact so that the observed bruising is actually the capillaries between the fingers. Mother believes that the lines are related to the hard wood floor and from falling off the bed. I explained that my team performs consults related to bed falls multiple times per week and that this is not the pattern of injury observed in those cases."

¶ 33    The State proceeded to publish the comprehensive consultation note from Comer's CAPS team documented on April 12, 2024, reading, "[E]xam and history revealed an infant with right cheek bruising of three parallel lines with spiraling between them consistent with a partial slap mark and multiple healing rib fractures," and "[a]n infant fall from a bed is a common accidental injury which can have some injury, but not the injuries that are identified in [Z.I.]." The consultation note represented that "[t]he fall from the bed is not a plausible explanation for the pattern spiraling slap mark on the right cheek, nor the healing rib fractures [which] in my medical opinion represents more than one episode of child abuse." The medical

diagnosis given for Z.I.'s injuries was "[c]hild physical abuse, multiple healing rib fractures, subconjuntival [*sic*] hemorrhage pattern, facial bruising." Dr. Schwartz's "Final Diagnostic Impression" read, "There are a total of thirteen rib fractures that occurred at least two different times. In my medical opinion, this case represents more than one episode of physical abuse."

¶ 34    The State then published photographs of Z.I.'s injuries contained in the hospital records, including close-ups of her right cheek revealing the patterned bruising and the left-eye subconjunctival hemorrhage and abrasion.

¶ 35    Respondent's counsel renewed her request for a continuance to bring Dr. Schwartz and Dr. Matshes in for testimony, requesting a March hearing date. The juvenile court denied the request, continuing the matter to the preselected second hearing date of December 19, 2024, and directing respondent's counsel to call respondent and any other witnesses at that time.

¶ 36    On December 19, the adjudication proceedings resumed, and respondent testified. Respondent explained her employment as a certified nursing assistant and home care aide and her living situation as of April 2024, when she lived in Gary, Indiana, and spent intermittent nights at her mother's and grandmother's homes in Chicago. Respondent testified that she was at her mother's house on April 9, 2024, and that she had believed Z.I. to be asleep in her car seat in the kitchen where she was cooking, when she heard a "thud" upstairs followed by Z.I.'s cry. She realized that Z.I. was missing from her car seat and ran upstairs, past her sister who had also heard the noise, and into the bedroom where she found K.G. holding Z.I. and attempting to quiet her. K.G. then explained to respondent that Z.I. had fallen when she went to the bathroom. Respondent testified that, "[Z.I.] was crying, but once I held her she stopped crying and I didn't notice anything [physically]." Respondent then finished cooking and returned that evening with Z.I. and K.G. to her home in Gary. Respondent testified that she

took Z.I.'s blood pressure and temperature and examined her body for bruises before she went to sleep. She described the infant's disposition at that time as "happy" and "calm."

¶ 37    Respondent testified that the following day, April 10, 2024, she was at work when she received a FaceTime call from K.I., who was watching Z.I. that morning and had noticed marks on the infant's cheek. Over the FaceTime call, respondent observed "dark lines" on Z.I.'s cheek and decided she would bring Z.I. to the hospital after her shift ended at 7 p.m. At Comer, the treating medical staff informed respondent that they would perform a CT scan and X-ray, and they also tried to insert an intravenous catheter (IV) for Z.I. Respondent testified that the medical staff were unable to insert the IV after three failed attempts, taking approximately one hour, and she observed that Z.I. was "kind of in distress." Respondent then decided to leave the hospital with Z.I., even though Z.I. had yet to undergo the CT scan. Respondent testified that she was interested in the results of a CT scan as she had concerns that Z.I. had injured her head and thought it might also explain her facial bruising. Respondent testified that she left Comer around 11 or 11:15 p.m. and thereafter went to drop K.G. at her mother's house. She testified that she was "trying to go to the University of Illinois" to have Z.I. examined at a different hospital than Comer. It was at that time, respondent testified, that a personnel member from Comer called her to bring Z.I. back "so we can make sure the baby is not bleeding in her brain." Respondent testified that she then brought Z.I. "right back," returning to Comer at around 12 or 12:20 a.m. Z.I. was taken for new X-ray scans and a CT scan and was subsequently discharged.

¶ 38    Respondent testified that the following day, April 11, 2024, she attended a funeral for her best friend, which lasted from 9 a.m. to 3 p.m. She left the service early and retrieved Z.I. to return to Comer after having received a call from the hospital instructing her to do so.

Respondent testified that she was informed during that phone call that Z.I. had nine healing fractures. She testified that she had never before had any concern that Z.I. had bone fractures, but she had noticed constipation for which she had previously brought Z.I. to the hospital around February 11, 2024, and received a suppository to treat the condition. Respondent also testified that "when I touched [Z.I.'s] side and she was always twitching and I thought it was because she was constipated."

¶ 39     On cross-examination, respondent explained that she did not direct K.I. to bring Z.I. to the hospital immediately when he first expressed concern regarding the marks on Z.I.'s face the morning of April 10 as he was not licensed to drive. She later testified that she knew no one else who could bring Z.I. to the hospital at that time, and she made no attempts to contact paramedics or medical transport options. Respondent testified that she had observed K.G. carrying Z.I. on two prior occasions and explained to her how it was unsafe behavior. On the day of the injury, respondent testified, Z.I. was in the same room as her—the kitchen of her mother's home—and was in her car seat, unbuckled. Respondent testified that she chose not to bring Z.I. to the hospital immediately after the fall because she "noticed that she stopped crying" and "[s]he was still smiling after I grabbed her." Respondent further testified that she knew from her line of work that it could often be difficult to insert an IV into an infant's arm, and according to respondent, Z.I. was not responsive to calming tactics that the medical team tried in the hospital. Respondent felt that Z.I. was in distress, at which point she left with Z.I. before Z.I. could receive a CT scan. Respondent testified that she planned to take Z.I. to the University of Illinois Hospital after leaving Comer but never did as she "got stopped."

¶ 40     On redirect examination, respondent testified that she had made the judgment that the University of Illinois Hospital would treat Z.I. more quickly based on her experience working

15

at both hospitals. She also testified that she had believed her 23-year-old sister to have had Z.I. when she first noticed her missing from the car seat in the kitchen on April 9.

¶ 41    During closing argument, the State clarified that it was not requesting perpetrator findings, as Z.I. had multiple other caregivers at the time she was in respondent's custody. The State again cited *J.C.*, 2011 IL App (1st) 111374, ¶¶ 11, 20, for the contention that uncontroverted evidence of child physical abuse is sufficient for an adjudication of abuse. Respondent's counsel contested this interpretation of *J.C.*, positing that the "uncontroverted or unrebutted medical testimony *** does not relieve them of their burden."

¶ 42    In reviewing the evidence supporting findings of abuse and neglect, the State called attention to its exhibit 3, in which Z.I.'s medical records indicated that, at respondent's request, Comer ordered genetic testing from Mayo Clinic to rule out the possibility of an osteogenesis imperfecta diagnosis. Z.I.'s results were negative, making the disease a "much less likely" cause of her injuries.

¶ 43    The juvenile court adjudicated both K.G. and Z.I. neglected due to an injurious environment per section 2-3(1)(b) of the Act and abused due to substantial risk of injury pursuant to section 2-3(2)(ii) of the Act. The juvenile court also found Z.I. to have been physically abused pursuant to section 2-3(2)(i) of the Act but did not identify a perpetrator. In its ruling, the court noted that Z.I. had been left unbuckled in her car seat while respondent was cooking and that both she and K.G. were young enough to be dependent on the adults in charge of their care. The court questioned the feasibility of K.G.'s ability to lift Z.I. or the lack of evidence supporting that account. Noting that the medical evidence was uncontroverted, the court held that Dr. Schwartz's consultation note was properly admitted under the business record exception of the Act. The court emphasized the unrebutted evidence of Z.I.'s multiple

bilateral rib fractures at different stages of healing, stating that "[v]arious stages of healing causes a tremendous red flag to the baby." The court ruled that the preponderance of evidence supported the conclusion that these fractures, coupled with Z.I.'s subconjunctival hemorrhage and bilateral facial bruising, were consistent with non-accidental injury and could not be attributed to "a simple fall from the bed."

¶ 44                    *Dispositional and Permanency Hearings*

¶ 45        A dispositional hearing was conducted on January 6, 2025. The State called a single witness, Denise Dejunae Nutall (Nutall), who was the assigned caseworker since the case was opened. Nutall explained the minors' current placements. K.G. was living with her paternal grandmother, excelling in first grade, engaged in weekly individual therapy with the agency, and had last had a supervised visit with her mother in November 2024. Z.I. was developing on target and living in a new placement with her maternal grandmother after moving from an initial fictive kin placement for which respondent had raised several concerns. The minors had visits with each other multiple times a week.

¶ 46        Nutall testified that respondent had been assessed for individual therapy, substance abuse evaluation and treatment, random drug screenings, domestic violence and parenting classes, and parenting coaching. Respondent was reportedly participating regularly in individual therapy, had completed the substance abuse assessment (but not the recommended 75 hours of outpatient service for marijuana usage), completed one random drug screening of multiple requested, attended two domestic violence sessions, and completed parenting classes.

¶ 47        After arguments, the juvenile court made the minors wards of the court and appointed the DCFS guardianship administrator as guardian with right to placement. The juvenile court found respondent unable to care for, protect, train, or discipline both minors pursuant to section

17

2-27 of the Act (705 ILCS 405/2-27(1)(d) (West 2024)). The court found that respondent had made some progress, and it established a permanency goal of return home in 12 months for both minors.

¶ 48    Respondent filed this timely appeal on February 4, 2025.

¶ 49                                ANALYSIS

¶ 50    In this appeal, respondent asserts that the juvenile court abused its discretion in refusing to grant a continuance to allow her to present expert testimony countering the Comer CAPS team's physical abuse findings. Respondent also asserts that her due process right to confront witnesses was violated when the juvenile court denied her request for a continuance to allow her to subpoena the State's key medical witness, Dr. Schwartz. Furthermore, respondent contends that the CAPS consultation note describing the medical findings of physical abuse for Z.I. was improperly admitted under the Act's business record exception, as it was a document prepared in anticipation of juvenile court proceedings. Respondent appeals only these aspects of the adjudication order, raising no challenges to the dispositional order. As respondent's appeal does not address the overall sufficiency of the evidence supporting the juvenile court's adjudication findings, our review is limited to the procedural issues she identifies in the hearings which gave rise to these conclusions.

¶ 51    As a preliminary matter, we observe that this is an accelerated appeal pursuant to Illinois Supreme Court Rule 311(a) (eff. July 1, 2018), which addresses the disposition of child custody and related appeals. Rule 311(a)(5) provides that an appellate court shall issue its decision within 150 days after the filing of the notice of appeal "[e]xcept for good cause shown." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). As the notice of appeal was filed on February 4, 2025, the 150-day period would have typically expired on July 7, 2025, following the Fourth

18

of July holiday. Respondent, however, requested and was granted four extensions of time for filing her opening brief. The State also requested and was granted an extension of time for filing its response brief, and the public guardian was granted three extensions of time for the same. Respondent was granted a further extension to file her reply brief but ultimately elected not to file a reply. Since this case as a result was not ready for disposition until February 2026, we find that good cause is shown for the delay in filing this order. See, *e.g.*, *In re J.S.*, 2020 IL App (1st) 191119, ¶ 36.

¶ 52    Turning to the merits, we first address respondent's arguments concerning the juvenile court's denial of her motion for continuance. It is within a juvenile court's sound discretion whether to grant or deny a motion for continuance, and therefore a denial of a motion for continuance is reviewed pursuant to the abuse of discretion standard. *In re D.M.*, 2020 IL App (1st) 200103, ¶ 20. A ruling that constitutes an abuse of discretion is "arbitrary, fanciful, or unreasonable" (*id.*) and demonstrates "manifest abuse or palpable injustice" (*In re Jamarqon C.*, 338 Ill. App. 3d 639, 644 (2003)).

¶ 53    Under the Act, a juvenile court may continue an adjudication hearing for no more than 30 days and only for good cause shown—meaning a showing that "the continuance is consistent with the health, safety and best interests of the minor." 705 ILCS 405/2-14(c) (West 2024). The Act further dictates that "good cause" be construed strictly. *Id.* A continuance must be requested by written motion no later than 10 days prior to the adjudication hearing. *Id.* The Act is explicit in the reasoning behind its rigidity, recognizing that "serious delay in the adjudication of abuse, neglect, or dependency cases can cause grave harm to the minor and the family and that it frustrates the health, safety and best interests of the minor and the effort to establish permanent homes for children in need." *Id.* § 2-14(a).

¶ 54   Here, respondent filed a motion for continuance on December 12, 2024—only five calendar days before the December 17 adjudication hearing—thereby violating the 10-day notice requirement of the statute. See *id.* § 2-14(c). Further, at the hearing respondent requested a continuance to March 2025—which at three months past the original adjudication date would have well exceeded the permissible 30-day extension period allowed under the statute. See *id.* Aside from these procedural defects, respondent also failed to include the factual findings in the motion and accompanying affidavit that the statute requires to demonstrate that a continuance would be consistent with the health, safety, and best interests of the minors. See *id.* Instead, respondent's motion focused on her counsel's "best efforts to secure a consultation" with the potential expert, and his belief that a medical expert was "potentially material and necessary" to provide an interpretation of the medical records that the State would likely seek to introduce at the adjudication hearing. Counsel's affidavit simply described his efforts to secure and convene with an expert who would provide potential trial testimony, as well as counsel's leave from the public defender's office from mid-September until December 4, 2024. These contents fail to demonstrate how the continuance would be "consistent with the health, safety and best interests of the minor" as the Act requires. Coupled with counsel's failure to meet the timing requirements of the statute, these deficiencies are fatal to respondent's argument for abuse of discretion on appeal.

¶ 55   In addition to the statutory defects described above, counsel's motion failed to meet the requirements outlined for motions for continuance in Illinois Supreme Court Rule 231(a) (eff. Jan. 1, 1970). As here, where the given cause for respondent's motion for continuance is the absence of material evidence, Rule 231(a) requires that the moving party file an affidavit with the motion demonstrating (1) that the party used due diligence to obtain the evidence or was

20

in want of time to obtain it; (2) the facts which comprise the evidence; (3) that the party used due diligence to obtain a witness's place of residence, if the evidence is a witness's testimony; and (4) that the party can procure the evidence if provided further time. *Id.* At best, respondent's counsel has satisfied the due diligence requirement in that he explained his efforts to meet with the potential witness. See *id.* The affidavit plainly failed to address the other three requirements, however—counsel neglected to include the facts underlying the material evidence, provide a name and address for the expert witness, and demonstrate his ability to procure the evidence in question if granted a continuance. See *id.* Indeed, the last lines of respondent's counsel's affidavit state: "[C]ounsel asked the potential expert to confirm, in the event counsel does in fact want to call him as a witness, if he is still available ***. As of the time of the filing of this motion, counsel has not heard back from the potential expert." Respondent's counsel therefore was not only unaware at the time of the motion of the projected factual content of his potential expert's testimony—as evidenced by his admission at the adjudication hearing that he was not yet in possession of an expert report from Dr. Matshes—but he also revealed that he might not be able to procure the supposedly material evidence in question, even if granted a continuance, as he had not heard back from his potential expert at the time of filing.

¶ 56    As the juvenile court noted in its ruling on respondent's motion for continuance, respondent also failed to supplement or amend the CMC order to reflect the addition of this material witness. Such a modification is required pursuant to Illinois Supreme Court Rule 218(c) (eff. Feb. 2, 2023):

> "The order controls the subsequent course of the action unless modified. All dates set for the disclosure of witnesses, including rebuttal witnesses, *** shall be chosen to

ensure that discovery will be completed not later than 60 days before the date on which the trial court reasonably anticipates that trial will commence, unless otherwise agreed by the parties."

¶ 57   Here, the parties' CMC order required final disclosure of all witnesses two weeks prior to trial and disclosure of any expert witness reports three weeks prior to trial. As the motion and accompanying affidavit failed to meet the requirements of the Act and our supreme court rules, the juvenile court acted within its sound discretion in denying respondent's motion for continuance to add a material witness. See *D.M.*, 2020 IL App (1st) 200103, ¶ 20.

¶ 58   To the extent that it should be treated as a separate motion, respondent's motion for continuance to subpoena Dr. Schwartz, made orally during the adjudication hearing, was similarly improper. Not only did counsel fail to provide any advance written notice for this motion, as required by the aforementioned provision of the Act governing continuances for adjudication hearings (see 705 ILCS 405/2-14(c) (West 2024)) and the procedural requirements of Illinois Supreme Court Rule 231(a) (eff. Jan. 1, 1970), but counsel also failed both to amend the CMC order in accordance with Rule 218 as discussed above (see Ill. S. Ct. R. 218(c) (eff. Feb. 2, 2023)) and to properly subpoena Dr. Schwartz under the procedures of Rule 237(a) (see Ill. S. Ct. R. 237(a) (eff. Oct. 1, 2021) (establishing the procedures for service of subpoenas to compel the appearance of a witness at trial)). Rule 231(f) specifically addresses the issue of timeliness for motions for continuance, stating: "No motion for the continuance of a cause made after the cause has been reached for trial shall be heard, unless a sufficient excuse is shown for the delay." Ill. S. Ct. R. 231(f) (eff. Jan. 1, 1970); see *Sinram v. Nolan*, 227 Ill. App. 3d 241, 243 (1992) ("Our legal system cannot work efficiently if continuances are readily available on the day of trial."). Here, the motion for continuance to cross-examine Dr. Schwartz

was made the day of the trial, with the only excuse shown for the delay consisting of respondent's counsel's efforts to consult with an expert who could provide rebutting testimony. If respondent wanted to compel Dr. Schwartz's appearance at the adjudication hearing, she could have properly amended the CMC order and served a subpoena in compliance with our supreme court rules, regardless of the status of her rebutting expert's testimony. Her failure to do so warranted the juvenile court's denial of the motion, as was well within the court's discretion. See *Jamarqon C.*, 338 Ill. App. 3d at 644.

¶ 59    Respondent next contends that the juvenile court's denial of her motion for continuance to allow her to subpoena and cross-examine Dr. Schwartz constituted a due process violation infringing upon her right to confront witnesses. Although respondent acknowledges that the right to confront witnesses applies less strictly in civil contexts, she argues that "hearsay statements, like Dr. Schwartz['s] in this case, offend[ ] the very essence of the liberty that the confrontation clause and its embodiment in the right to due process protect," and that the juvenile court's denial of her motion here constituted "a gross deviation from fair procedures."

¶ 60    Unlike in the criminal context, where the sixth amendment confrontation clause (U.S. Const., amend. VI), as incorporated against the states through the fourteenth amendment due process clause (*Pointer v. Texas*, 380 U.S. 400, 403 (1965)) and subsequently adopted by the Illinois Constitution (Ill. Const. 1970, art. I, § 8 (amended 1994)), provides defendants the right to confront witnesses used against them, the right to confront witnesses in civil contexts is less absolute. See *In re K.L.M.*, 146 Ill. App. 3d 489, 495 (1986) ("[A]lthough confrontation rights may be an aspect of due process in purely civil proceedings, the confrontation clause need not be applied strictly in such proceedings."). Perhaps for this reason, respondent fails to identify any authorities which specifically support this claim in her argument on appeal, instead

focusing her analysis on distinguishing the two categories of juvenile court cases in our jurisprudence in which the right was found not to have been violated—in cases involving virtual court proceedings during the COVID-19 pandemic, and cases involving hearsay statements of minors. See *In re R.D.*, 2021 IL App (1st) 201411, ¶¶ 12-14; *In re Es. C.*, 2021 IL App (1st) 210197, ¶ 24; *In re H.B.*, 2022 IL App (2d) 210404, ¶ 61; *In re Marcus E.*, 183 Ill. App. 3d 693, 704 (1989); *In re A.P.*, 179 Ill. 2d 184, 200 (1997). Due to respondent's lack of citation of any supporting authority for this point, considered in tandem with the procedural defects accompanying the motion, we decline to further consider it on review. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Argument *** shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities ***."); see, *e.g.*, *In re J.P.*, 331 Ill. App. 3d 220, 237 (2002) (declining review of claims for which respondent failed to "reference the record or cite to pertinent authority").

¶ 61        Respondent's next argument on appeal relates to the admission of the CAPS consultation note describing Z.I.'s injuries as consistent with physical abuse, which respondent contends amounts to reversible error. The admissibility of medical records documenting a "condition, act, transaction, occurrence or event" relating to a minor in abuse, neglect, or dependency proceedings is addressed in section 2-18(4)(a) of the Act. The Act reads:

> "Any writing, record, photograph or x-ray of any hospital or public or private agency *** made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a minor in an abuse, neglect or dependency proceeding, shall be admissible in evidence as proof of that condition, act, transaction, occurrence or event, if the court finds that the document was made in the regular course of the business of

the hospital or agency at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter." 705 ILCS 405/2-18(4)(a) (West 2024).

Such records must be certified by the attending doctor or other "responsible employee or agent of the hospital or agency" who has knowledge of the creation and maintenance of the subject matter of the records, and who can attest that the records are full and complete and satisfy the conditions outlined in this section of the Act. *Id.*

¶ 62       The admission of business records and other statutorily accepted hearsay exceptions in adjudication proceedings are reviewed under an abuse of discretion standard. *In re A.B.*, 308 Ill. App. 3d 227, 234 (1999). Under abuse of discretion review, the appellate court "must determine whether the circuit court acted arbitrarily without the employment of conscientious judgment or, in view of all the circumstances, exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted." (Internal quotation marks omitted.) *In re Nylani M.*, 2016 IL App (1st) 152262, ¶ 34.

¶ 63       Respondent argues that the CAPS consultation note did not fall under the Act's recognized business record exception as it was prepared in anticipation of litigation. Respondent cites *In re H.C.*, 2023 IL App (1st) 220881, ¶ 109, for this argument, in which this court held that the respondent's counsel was ineffective for failing to object to the admission of a doctor's report, which had surmised from medical records that a minor with disabilities had been medically neglected. Although that case, similar to this one, involved a child advocacy and protection team consultation which resulted in evidence admitted in adjudication proceedings under a business record exception (*id.* ¶ 58), it also contained several key factual distinctions from the case at hand.

¶ 64        In *H.C.*, the consulting physician was called in by DCFS two months after the triggering incident involving the minor had occurred, and the opening lines of the consultation note read, " 'Reason for this note: this note is generated after DCFS report was made for medical neglect in Nov 2019. Agency requested Child Advocacy and Protection evaluation of medical record.' " *Id.* By contrast, Dr. Schwartz and her team were called in the day after Z.I. was readmitted to Comer due to her scans revealing multiple bilateral rib fractures in various stages of healing. Additionally, the court in *H.C.* noted, "If we remove Dr. Jones's opinion from the equation, we find there is little to show actual abuse or neglect." *Id.* ¶ 144. Here, the nature of Z.I.'s injuries themselves, coupled with the subsequent elimination of alternative explanations such as birth injuries or osteogenesis imperfecta, provides further evidence of abuse or neglect independent of Dr. Schwartz's reports.

¶ 65        The court in *H.C.* acknowledged that the doctor's report in that case was "a different animal" from most evidence admitted under the Act's section 2-18(4)(a) exception. *Id.* ¶ 118. Whereas the report in *H.C.* was prepared specifically to give weight to DCFS's legal argument of neglect when it petitioned for adjudication of wardship, the consultation here was made in the regular course of business after Comer emergency room staff requested interventions by DCFS and CAPS following the discovery of Z.I.'s rib fractures. See 705 ILCS 405/2-18(4)(a) (West 2024) ("[A] memorandum or record of any condition, act, transaction, occurrence or event relating to a minor in an abuse, neglect or dependency proceeding, shall be admissible *** if the court finds that the document was made in the regular course of the business of the hospital ***."). Unlike the doctor in *H.C.*, Dr. Schwartz personally examined Z.I. in the hospital, spoke with respondent, and discussed recommendations with Z.I.'s medical team.

¶ 66 Respondent also failed to adequately demonstrate substantial prejudice in her appeal. See, *e.g.*, *In re R.L.*, 2021 IL App (1st) 210419, ¶ 16 ("The denial of a continuance request is not a ground for reversal unless the complaining party has been prejudiced."). The only passing reference to prejudice in respondent's brief was an unsupported statement that respondent "was prejudiced by the denial of the continuance because she was unable to produce the rebutting expert testimony that the State insists she needed." See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."); *id.* ("Argument *** shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities ***."). We thus do not find that the juvenile court arbitrarily, unreasonably, or prejudicially abused its discretion in admitting the consultation note into evidence. See *Nylani M.*, 2016 IL App (1st) 152262, ¶ 34.

¶ 67 For the reasons discussed above, the juvenile court did not abuse its discretion in denying respondent's motions for continuance and in admitting the CAPS consultation note under the Act's business record exception.

¶ 68 CONCLUSION

¶ 69 The judgment of the circuit court of Cook County is affirmed.

¶ 70 Affirmed.

---

*In re Z.I.*, 2026 IL App (1st) 250207

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 24-JA-300, 24-JA-301; the Hon. Demetrios G. Kottaras, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Madeline R. Townsend, Assistant Public Defender, of counsel), for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Gina DiVito, and Marina C. Para, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain, Carrie Fung, and Juliane Johnson, of counsel), for appellee. |